WESTERN STATES CONSTRUCTION, INC., AND MAX MICHOFF, AN INDIVIDUAL, APPELLANTS, *v.* LOIS MICHOFF, RESPONDENT.

No. 19793

November 5, 1992                    840 P.2d 1220

---

932

[Rehearing denied November 17, 1992]

*Crowell, Susich, Owen & Tackes,* Carson City, for Appellants.

*Aebi & McCarthy,* Carson City, for Respondent.

## OPINION

By the Court, YOUNG, J.:

Appellant Max Michoff ("Max") and respondent Lois Michoff ("Lois") cohabitated for approximately nine years, although they were never married. They formed Western States Construction, Inc. during their relationship. Lois provided valuable services in the operation of the business based on Max's representations that she was a co-equal owner. When they terminated their relationship, Lois brought this action seeking one-half of the parties' assets. The district court entered judgment in favor of Lois and against Max and Western States Construction, Inc. For the reasons discussed herein, we affirm the judgment against Max but reverse it against the corporation.

### Facts

In 1977, Lois and Max became romantically involved, even though Max was already married. At the time, Lois was employed as a prototype technician,[1] working forty hours per week and earning eleven dollars per hour. Their relationship continued, and Max divorced his wife. Lois and Max then decided to, and did, live together.

In 1979, Lois and Max moved from California to Carson City, Nevada. That same year, Lois legally changed her name to Lois Michoff.[2] The parties started a construction equipment rental

---

[1]A prototype technician builds printed circuit boards from scratch.

[2]Lois claimed that she changed her name at Max's request; he believed that if they had a woman-owned, construction-type business, they would "fare better in getting jobs." For example, according to Lois, they could bid five percent over the low bid and nevertheless be classified as the low bidder. It is noteworthy that Max's attorney handled the name change.

business called L&M Rentals (named for Lois and Max). Lois obtained the business license and paid the licensing fees. The business license listed Lois as the sole owner. Max wanted Lois to be the sole owner so that his ex-wife could not make a claim against the business.[3] Although Max contributed a large portion of the funds to start L&M Rentals, Lois and Max had agreed that they were co-equal owners of the business. Consequently, Lois devoted her efforts and time toward running the business, including such integral functions as bookkeeping and maintaining the equipment.

Approximately six months after starting L&M Rentals, Lois and Max discovered that they needed a contractor's license to operate the business. Lois therefore applied for such a license but listed the name of the business as Western States Construction. Lois was listed as the owner of the business and Max was listed as the "qualified employee." Lois testified that they had agreed that it was their company; thus, again, Lois provided much of the skill and labor necessary for the business' success. Her services included doing all of the office work (bookkeeping, payroll, and paperwork) and assisting in the maintenance, service, and running of the equipment. The profits from the business were either invested into the business or retained as savings.

In 1983, Lois and Max incorporated the business, naming it Western States Construction, Inc. ("Western States"). Lois testified that they agreed to hold the company as co-equal owners, each owning fifty percent of the company. The articles of incorporation listed Lois and Max as the Board of Directors and the Incorporators. Also, they were the sole officers of the corporation: Lois was treasurer, and Max was president and secretary. They opened checking and payroll accounts for Western States, and both Lois and Max had authority to withdraw funds from these accounts.

Lois continued to do the bookkeeping, and she also updated the records, reviewed bids, negotiated contracts and labored in the field—performing such jobs as flagging and running heavy equipment. Whenever Western States sought a license increase, it was Lois who applied for the increase. In order to obtain the neces-

---

[3]It is uncontroverted that Max had concealed $50,000 from his former wife and the court in which he obtained his divorce. The record, however, does not indicate whether Max had defrauded his former wife out of other assets. In any case, Max was seized with an irresistible impulse to hide some of his assets. Thus, when Lois and Max first moved to Carson City, Max formed a partnership with a local contractor and immediately placed all of his assets into this business. Thereafter, when the parties started L&M Rentals, Max transferred all of his assets to L&M Rentals. Most of the cash was then used to purchase a certificate of deposit in the name of L&M Rentals.

sary contractor's bonds from the Contractor's Board, Lois personally guaranteed the bonds.

During their relationship, Max held Lois out as his wife. In fact, in 1984, Max entered a partnership agreement with Robert Frybarger and requested that Lois sign a consent of spouse.[4] Max and Lois filed joint tax returns as husband and wife commencing in 1980 and continuing through 1986. For the years 1983 through 1986, they also filed tax returns under Western States, showing Lois as an officer and owner of the corporation. Moreover, Western States elected to file a sub-chapter S election on March 24, 1983. The election was signed by Lois and Max and designated the holdings of the corporation as community property.

After Lois and Max terminated their relationship (Lois apparently left Max because he had been physically abusing her), she brought this action, seeking a declaration and judgment that she owns one-half of the parties' assets, including Western States. She alleged that she had performed valuable services based on Max's representations that she owned one-half of the corporation. Specifically, the complaint provided:

> That at all times pertinent herein, Defendant, MAX MICHOFF, represented to [Lois] that she was entitled to one-half (½) of the assets held by Defendant, Western States Construction, Inc. In accordance with the representations, [Lois] has performed valuable services over many years last past, including those as set forth above.
>
> . . . .
>
> That based upon the representations as aforestated, [Lois] requests a determination by this Court that she is entitled to one-half (½) of the assets of the parties whether held solely in the name of MAX MICHOFF, Defendant Corporation, or [Lois].

After a trial, the district court found that there existed an express and an implied agreement between the parties to acquire and hold the properties as if they were married. The court ruled that the community property laws should apply by analogy and thus entered judgment in favor of Lois and against Max and Western States for one-half of the net assets of the parties less the value of the property already taken.[5]

---

[4]This provision provided: "We, the undersigned, being the respective wives to the parties to the foregoing partnership agreement, have read and understand said agreement executed by our husbands. Each of us hereby approves and consents to the said partnership agreement and agrees to be bound by all of its provisions."

[5]The judgment also set aside in trust the sum of $22,500, representing one-half of the potential liability facing Western States in a pending lawsuit and ordered each party to pay one-half of the debt owed for a medical bill.

*Discussion*

Max contends that Lois did not plead any contractual claims against him. We disagree. Nevada is a notice-pleading state; thus, our courts liberally construe pleadings to "place into issue matters which are fairly noticed to the adverse party." Hay v. Hay, 100 Nev. 196, 198, 678 P.2d 672, 674 (1984). A complaint need only set forth sufficient facts to demonstrate the necessary elements of a claim for relief so that the defending party has adequate notice of the nature of the claim and relief sought. *Id; see also* Ravera v. City of Reno, 100 Nev. 68, 70, 675 P.2d 407, 408 (1984) (test for determining whether the allegations of a cause of action are sufficient to assert claim is whether allegations give fair notice of nature and basis of claim and relief requested).

We have previously held that allegations similar to those contained in this case were sufficient to state a cause of action for breach of an implied-in-fact contract to acquire and hold property as if the parties were married or general partners. *See Hay,* 100 Nev. at 198, 678 P.2d at 674. In that case, Virginia Hay alleged that she and Tom Hay had held themselves out as husband and wife, although they were not married. *Id.* at 197, 678 P.2d at 673. She further alleged that they had pooled their money as though they were a "marital community or a general partner." *Id.* at 198, 678 P.2d at 674. Likewise, here, Lois alleged that she and Max had held themselves out as though they were married. Lois also alleged that based on Max's representations that she was a co-equal owner of Western States, she performed valuable services. Lois' complaint adequately apprised Max that Lois pursued an ownership interest in the assets accumulated during their relationship based on an implied contract action. *See* Smith v. Recrion Corp., 91 Nev. 666, 668, 541 P.2d 663, 664 (1975) (the terms of an implied contract are manifest by conduct).

Indeed, Max's pretrial pleadings acknowledged that he understood the grounds on which Lois based her complaint. In his answer to the complaint, Max contended, as an affirmative defense, that the complaint should fail for lack of consideration. Moreover, Max submitted a hearing and a trial date questionnaire, and on each one, he stated that the nature of the action was one of contract.

Lois even confirmed her position in her trial statement:

> [Lois], for the next several years, continued to act as an officer of the corporation and generally handled the corporate paperwork, bid documents, and bookkeeping for the corporation. On occasion, she even handled and operated the heavy equipment of the corporation. [Lois] was held out by [Max] as his wife to the parties, acquaintances, and friends,

and she virtually acted as a co-owner of the business with [Max] providing valuable services to the business with no substantial compensation. *All of the above was done on the basis of an agreement between the parties and the representations of [Max] that the MICHOFFS were and would be equal co-owners of [Western States].*

(Emphasis added.) Max recognized in his trial statement that Lois based her claim on a contract action, stating: "In her Second Cause of Action Lois is apparently asserting a contractual right."

Therefore, we conclude that under Nevada's notice pleading rule, Max was given sufficient notice that Lois' complaint stated a cause of action for breach of an express and an implied contract to acquire and hold property as though the parties were married.

Max also contends that to allow unmarried cohabiting parties to hold their property as though they were married violates Nevada's strong public policy of encouraging legal marriages. We strongly disagree and emphasize that this court by no means seeks to encourage, nor does this opinion suggest, that couples should avoid marriage. Quite to the contrary, we reaffirm this state's strong public policy interest in encouraging legally consummated marriages. However, this policy is not furthered by allowing "one participant in a meretricious relationship to abscond with the bulk of the couple's acquisitions." *Hay,* 100 Nev. at 199, 678 P.2d at 674.

Unmarried couples who cohabit have the same rights to lawfully contract with each other regarding their property as do other unmarried individuals. *Id.* Thus this court must protect the reasonable expectations of unmarried cohabitants with respect to transactions concerning their property rights. We therefore adopted, in *Hay,* the rule that unmarried cohabitants will not be denied access to the courts to make property claims against each other merely because they are not married. *Id.*

In *Hay,* we cited with approval the holding in Marvin v. Marvin, 557 P.2d 106 (Cal. 1976), which provided:

The courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services . . . . In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement or partnership or joint venture, or some other tacit understanding between the parties. The courts

> may also employ the doctrine of *quantum meruit,* or equitable remedies such as constructive trust or resulting trusts, when warranted by the facts of the case.

*Hay,* 100 Nev. at 199, 678 P.2d at 674 (quoting *Marvin,* 557 P.2d at 110). We then expressly held that the remedies in *Marvin* are available to unmarried cohabitants. *Id.* As stated in *Marvin,* adults who voluntarily live together "may agree to pool their earnings and to hold all property acquired during the relationship *in accord with the law governing community property."* *Marvin,* 557 P.2d at 116 (emphasis added).

Our brother SPRINGER believes that the district court was misled by our statement in *Hay* that if unmarried cohabiting adults agree to hold their property as if they are married, "the community property laws of the state will apply by analogy." JUSTICE SPRINGER concludes that "[u]nmarried persons cannot own community property, by analogy or otherwise." *Marvin,* however, strongly supports our statement in *Hay* that the community property law may apply by analogy. While unmarried couples *cannot actually own* community property, this is so only because community property is a creature of statute which arises after a couple is legally married. *See* NRS 123.220. Yet unmarried couples are not precluded from holding their property *as though* they were married. *See Marvin,* 557 P.2d at 116. In such a case, the community property law can apply by analogy. *Hay,* 100 Nev. at 199, 678 P.2d at 674. Thus we hold that unmarried cohabiting adults may agree to hold property that they acquire as though it were community property.

Max next argues that Lois failed to prove the existence of a contractual agreement because she failed to show the basic elements of the contract, namely, that she did not allege a meeting of the minds and harmonious understanding as to the tenor and provisions of the agreement. As stated in *Recrion Corp.,* 91 Nev. at 668, 541 P.2d at 664, the terms of an express contract are stated in words while those of an implied contract are manifested by conduct.

There is no evidence that the parties expressly agreed to hold their property as though they were married. The district court erred in so finding. Nevertheless, we conclude that there is substantial evidence to support the district court's finding that Lois and Max impliedly agreed to hold their property as though they were married. In addition to living together and holding themselves out to be a married couple, this evidence included the parties filing federal tax returns as husband and wife, the parties

designating that they held the Western States stock as community property in their Subchapter S election, and Max's insistence that Lois sign a consent of spouse to effectuate a partnership he wanted to enter. The district court's judgment against Max is therefore affirmed.[6] Pandelis Constr. Co. v. Jones-Viking Assoc., 103 Nev. 129, 130, 734 P.2d 1236, 1237 (1987).

However, the district court erred when it entered judgment against Western States, for Western States was not a party to the contract and therefore could not be liable for Max's breach thereof. Thus, we reverse the judgment against Western States and remand for further proceedings as to the disposition of the parties' property.[7]

MOWBRAY, C. J., ROSE and STEFFEN, JJ., concur.

SPRINGER, J., dissenting:

Lois and Max are not married; yet the trial court treated them as though they were married. The trial court heard and decided this case under our divorce statute (NRS Chapter 125, *Marriage and Dissolution*). The trial court disposed of the property owned by each party as though it were community property, calling it "community property by analogy." The final decree in this case was entered in accordance with the divorce statute, NRS 125.150, which provides that "[i]n granting a divorce, the court . . . [s]hall make such disposition of . . . [t]he community property of the parties . . . as appears just and equitable." I am so bold as to say that unmarried people cannot be treated by the

___

[6]With regard to Max, we commend the district court for its handling of this case. This case involved the sensitive area of property rights between unmarried cohabiting adults (an area which traditionally has been judicially tempered by moral views) and where the parties perhaps did not have the "cleanest" hands. The district court fairly applied the law of this state to reach an equitable result.

Lois wanted to formalize their relationship with a marriage ceremony, but Max balked. He apparently felt that his financial interests would be better served with a more informal arrangement. However, when the trial court sided with Lois, Max found that he had jumped from the frying pan of a prior marriage into perhaps the hotter fire of a contractual relationship. With hindsight, he may have fared better financially if he had been married. However, Max was, as the poet says, "The captain of [his] fate." We cannot see any benefit—except possibly to the lawyers—in remanding this action to be repled with the parties rehashing the same facts before the trial court.

[7]In the event the district court determines that the parties are to have equal ownership in Western States, the judgment would have to require that Max transfer one-half of his shares of Western States stock to Lois since all stock was issued in Max's name. We intimate no view as to whether the district court should appoint a receiver for Western States.

courts like married people, that unmarried people do not have the legal capacity to hold community property, and that unmarried people are not entitled to property disposition decrees under our divorce statute. I almost stopped here; but then it occurred to me that the majority opinion might be taken seriously and that unmarried people like Lois and Max might start knocking on the doors of our divorce courts. This though prompted me to write at some length on the novel legal principles announced by this court today, family law principles that I will refer to as the "Michoff Doctrine."[1]

The Michoff Doctrine permits "unmarried cohabiting adults" to enter into a kind of informal marriage contract which entitles them to have property that they acquire treated like community property and distributed by the divorce courts "as though" they had been formally married. These "Michoff Marriages" will henceforth be governed by our Marriage and Divorce statutes.

The Michoff Doctrine is comprised of two principles:

1. *The As-Though-Married Principle.* This principle sanctions an informal marriage-by-agreement which permits unmarried cohabitants to sue and recover under the divorce statute.

2. *The Community-Property-by-Analogy Principle.* This principle allows "unmarried cohabiting adults"[2] to "hold property . . . as though it were community property" and "in accord with the law governing community property." (Majority Opinion at 938).

---

[1]My not wanting unmarried persons to come to our divorce courts seeking a "just and equitable" division of their supposed "community property by analogy" certainly does not mean that I have any quarrel with the well-established law in Nevada that permits people like Lois and Max to sue each other, not for divorce, but for contractual or equitable claims that they might have against each other. *See, e.g.,* Hay v. Hay, 100 Nev. 196, 678 P.2d 672 (1984).

[2]All of the marital privileges conferred upon unmarried persons by the Michoff Doctrine appear to be given to the rather large class of "unmarried cohabiting adults." I note that the majority places no restriction on the number or gender of these adults. I assume that application of the doctrine is not restricted to two cohabitants of opposite sex in order to avoid conflict with Nevada's prohibition against common-law marriages; still, the thought of a band of unmarried cohabiting adults suing each other under our Marriage and Dissolution chapter is not a pretty one. I can envision roommates Larry, Moe and Curly, unmarried cohabiting adults, deeply involved in divorce litigation. Any one of the three would be in a legal position to move out and sue the others claiming that the three had an implied agreement to share, per *Michoff,* property that they acquire as though it were community property. Larry could then take advantage of the community property laws and NRS Chapter 125 so that he could ask a divorce court to divide their CPBA interests, pursuant to NRS 125.150. This problem and the problem of creating community property rights by "implied" agreement through some

In adopting the first principle of the Michoff Doctrine (applicability of the divorce statute (NRS Chapter 125) to unmarried persons), the trial court not only held that all of the property acquired by Max and Western States and Lois was *presumed* to be community property (or something very much like it), the trial court went further and divided the property in accordance with the divorce statute. Citing to NRS 125.150, the trial court ruled that the statute "requires that in making the disposition of community property the court shall divide the property in a just and equitable manner." After dividing the property in accordance with the mentioned divorce statute the court expressly ruled that, "said division is fair, just and equitable." For some reason, the divorce court did not attend to the remaining provisions of NRS 125.150, which require that community property division be made, "having regard to the respective merits of the parties and to the condition they will be left by the divorce, and to the party through whom the property was acquired, and to the burdens, if any, imposed upon it, for the benefit of the children." I am not sure why the trial court did not follow all of the provisions of NRS 125.150. If NRS 125.150 is to be applied to the dissolution of informal living arrangements (which, of course, it should not), then I would think that the entire statute should apply.

With regard to the second principle of the Michoff Doctrine, the principle of "community-property-by-analogy" (CPBA), I note that Lois has made no claim, in contract or otherwise, to any *specific* property owned by Max. Her claim is general and arises solely out of the status she claims to have attained because Lois and "Max had held themselves out as though they were married." (Majority Opinion at 936.) Lois' claim is not that Max agreed to give her a portion of any property that he acquired in his name after they started living together; rather, her claim is based on what she sees as "the rights of two parties with respect to beneficial ownership of the property held by them irrespective of the existence of marriage." (Lois' Trial Statement.) Lois admits in her trial testimony that she "had no interest in the business per se" and goes on to explain her position in this way: "for example, your wife may not have an interest in your law firm but yet she still has an interest in your—in you," that is to say, in Max himself. Lois appears to me to be claiming a status very similar to that of a common law wife, or maybe a "common-

undefined "conduct" on the part of cohabiting adults are problems enough; but the real problem in this case stems from its encouragement of informal marriage and in letting unmarried people create community property interests by merely agreeing to do so. Community property by nature and definition is created by operation of law. No other jurisdiction that I know of recognizes community property by agreement of unmarried parties.

law-wife-by-analogy''; and it is by virtue of this *status,* not contract, that she claims to be entitled to ''an interest'' in Max and in anything of value that Max might have acquired during their ''marriage by analogy.'' It is very clear to me that Lois makes no contractual claims to Max's property; she claims an interest *in him* arising out of their informal marriage. I insist that this is contrary to the letter and spirit of Nevada family law.

Community property in the State of Nevada is defined in NRS Chapter 123 (''Rights of Husband and Wife'') as all property which is acquired after marriage by either *husband or wife.* NRS 123.220. The legal community of property arises only by operation of law upon the solemnization of marriage. NRS 122.010; NRS 123.220. ''[N]o agreement between cohabiting parties can create community property or any other legal relationship similar to marriage.'' W. Bassett, *California Community Property Handbook,* § 2.03[A], at 2-22 (2d ed. 1990). How then did Lois, and then the trial court, and now this court, ever get the outlandish idea that unmarried persons could acquire and hold the significant rights inherent in the law of marriage and community property merely by agreeing that they should have such rights? Unfortunately, the answer to this question lies in one of our cases, Hay v. Hay, 100 Nev. 196, 678 P.2d 672 (1984). Here is the problematical language from *Hay:*

> Where it is alleged . . . and proven that there was an agreement to acquire and hold property as if the couple was married, the community property laws of the state will apply by analogy.

*Id.* at 199, 678 P.2d at 674.

The quoted *analogy* language is pure dictum and certainly has nothing to do with the holding in *Hay.* The only question decided in *Hay* was whether the plaintiff had stated a claim upon which relief could be granted, that is, whether her complaint set forth facts to establish the elements of a *contract* claim for relief. The issue had already been decided in Warren v. Warren, 94 Nev. 309, 579 P.2d 772 (1978); but we again held in *Hay* (1) that unmarried cohabitants had the *capacity* to contract and (2) that such a contract must have a *lawful subject matter.* In *Hay,* we held specifically that unmarried cohabitants ''have the same rights [capacity] to lawfully [sic] contract with each other regarding their property as do other unmarried individuals.'' 100 Nev. at 199, 678 P.2d at 674. Concerning the lawfulness of the subject matter, we merely said that such parties could not legally contract for ''meretricious'' sexual services, but that all other contractual arrangements were permissible. *Id.* No more need to have been said, for neither party in *Hay* claimed to a right to community property interests.

I have been able to find only one other case that has ever used the strange, "community-property-by-analogy" language in question. Omer v. Omer, 523 P.2d 957 (Wash.Ct.App. 1974). In *Omer,* a Washington intermediate appellate court toyed with a novel theory that has been called the "relationship" approach to settling disputes relating to property acquired by parties during unmarried cohabitation. The three-judge *Omer* panel awarded property to Helen Omer on a constructive trust theory but at the same time, in *dicta,* discussed another possible "theory (that) . . . has so far not been adopted in this state." *Id.* at 960. The theory mentioned but rejected by the *Omer* court was that certain "relationships of long and durable standing may give rise to community property rights similar to those which prevail between unmarried persons." *Id.* The *Omer* court went on to comment, gratuitously, that it might be a "better approach" to "let proof of the relationship itself . . . determine the merits of the claim and then, if warranted by the facts, hold that *the community property laws be applied by analogy* to determine the rights of the parties." *Id.;* (my emphasis). The *Omer* court, of course, did not hold that "proof of the [unmarried] relationship" could create legally enforceable community property interests and recognized that it was constrained by precedent in Washington not to follow what it thought might possible be a "better approach." *Id.* The *Omer* court was, consequently, compelled to employ "traditional" theories in determining the property rights of the unmarried parties and could not rely on the party's "relationship" or on the theoretical "approach" of "community property by analogy." *Id.* I find no case other than *Michoff* in which the property of unmarried persons has been treated like community property and divided by the courts in a divorce or divorce-like action.

The *Omer* "relationship" theory became visible in California in the case of In re Marriage of Cary, 109 Cal.Rptr. 862 (Cal. Ct.App. 1973). In *Cary,* the California Court of Appeal theorized that where there was something resembling a family relationship (whatever that is), the courts should be required to divide property of *putative* spouses equally.[3] *Cary's* "relationship" theory

---

[3]The concept of a putative spouse, which is distinct from a common law spouse, is derived from the Spanish civil law of community property, which was adopted by California and by Nevada. *See* William Q. DeFuniak & Michael J. Vaughn, *Principles of Community Property,* § 52, at 88, § 56, at 96 (2d ed. 1971). A putative spouse is defined in California as one who "believed in good faith that the marriage was valid." Cal. Civ. Code § 4452 (West Supp. 1992). Upon termination of a void or voidable marriage, property which would have been community or quasi-community property if the union had not been void or voidable, is divided in accordance with the California statute, Cal. Civ. Code § 4800 (West Supp. 1992), which provides for the division of community property. *Id.* at § 4800. The Nevada Revised

was very similar to that mentioned in *Omer*. *Cary* was strongly criticized as effecting judicial endorsement of common law marriages. *In re Cary—A Judicial Recognition of Illicit Cohabitation,* 25 Hastings L.J., 1226, 1246-1247 (1974). The California Supreme Court in Marvin v. Marvin, 557 P.2d 106, 116 (1976) (relied on so heavily by the majority), expressly "reject[ed] the reasoning of *Cary,*" observing that "[i]f *Cary* is interpreted as holding that the Family Law Act requires an equal division of property accumulated in nonmarital 'actual family relationships,' then we agree with *Beckman v. Mayhew* that *Cary* distends the act." *Marvin,* 557 P.2d at 120. *Marvin* expressly held that the "provisions of the Family Law Act do not govern the distribution of property acquired during a nonmarital relationship." *Id.* at 110. Similarly, NRS Chapter 125 does not govern the distribution of property acquired during a nonmarital relationship in Nevada. Other jurisdictions agree with the *Marvin* principle that property claims among unmarried persons are established not by any purported *status* created by cohabitation but by the *intent* of the parties to *contract*. *See, e.g.,* Schafer v. Superior Court, 225 Cal.Rptr. 513, 515 (Cal.Ct.App. 1986); Kozlowski v. Kozlowski, 395 A.2d 913 (N.J. 1978), *judgment affirmed by* 403 A.2d 902 (N.J. 1979); Watts v. Watts, 405 N.W.2d 303 (Wis. 1987).[4]

In sum, then, Lois was wrong when she asserted that the courts "recognize the rights of two [cohabiting] parties with respect to beneficial ownership of the property held by [the parties] irrespective of the existence of marriage." (Lois' Trial Statement.) It is the existence of marriage that informs the "beneficial ownership" known as community property. Community property is marital property, and without marriage the term is meaningless. Our laws define community property only in connection with and as an incident of marriage. Community property thus has no meaning or existence other than in the context of the *formal*

---

Statutes are distinguishable. There is no statutory provision with respect to a division of property between parties that acknowledges that even a "putative" spouse, *i.e.,* one who held a good faith belief that the marriage was valid, is to be afforded any entitlements which approximate those of a married person. *Compare* NRS 125.150; NRS 125.290 *et seq.* Even if we had such a statute, clearly Lois is not a putative spouse.

[4]Community property is a *legal* community of property which, without any agreement between the spouses, is arbitrarily imposed and takes effect upon the marriage of the parties. Community property arises only *by operation of law* upon the solemnized marriage of the parties. NRS 123.220 states that community property is "[a]ll property . . . acquired after marriage by either husband or wife"; NRS 122.010(1) defines marriage as a civil contract requiring consent and solemnization. There can be no community property (CPBA) by agreement alone.

relationship of marriage. To think that marriage is not the indispensable essence of community property and that community property or some novel analogue of community property could exist outside of marriage is completely out of harmony with conventional family law jurisprudence in community property jurisdictions. To hold that unmarried persons can hold community property (or "as-though" community property) and avail themselves of our marriage dissolution laws is to exhume the long-dead body of law relating to common law marriage, an institution abolished in Nevada almost fifty years ago. "Consent alone will not constitute marriage; it must be followed by solemnization as authorized and provided by this chapter." NRS 122.010. To allow community property (or its analogue, CPBA) to be created by "consent alone" is clearly contrary to the statute and contrary to Nevada's "strong public policy interest in encouraging legal marriage." *Hay,* 100 Nev. at 199, 678 P.2d at 674.[5]

Permitting community property to be created by cohabitation or contract is a disincentive to marriage; it gives unmarried persons the rights of community property without imposing upon them the mutual assumption of duties that is attendant to the marital status. Unmarried persons will now be in a position to *choose* whether or not they wish to be governed by community property law; whereas, community ownership is thrust upon married persons at the time of their marriage unless they agree in writing not to hold property as community. *See* NRS 123.190; NRS 123.220. The necessary result of today's judicial acceptance of "as-though" marriages and CPBA will be that married couples will automatically be controlled by community property laws unless they decide to "opt out"; whereas unmarried couples will now have the odd privilege of being able to choose (impliedly or expressly, orally or in writing) whether they wish to hold property regularly or as "community property by analogy." Such an arrangement is not only incongruous and disadvantageous to married persons, it is entirely inconsistent with the design and

---

[5]Permitting the mentioned kinds of informal marriage is fraught with apparently unforeseen difficulties. I cannot help but wonder what would happen when a real spouse challenges the distribution of community-property-by-analogy: "I know he has acquired property since he has been living with the other person(s); but I am his *real* wife, and I think what he has acquired is *real* community property." There is so much uncertainty inherent in these new kinds of relationships, and in CPBA itself, that I would anticipate a lot of litigation related to the Michoff Doctrine.

Another problem I see relates to the right to jury trial. If Lois had sued in contract, she or Max could have demanded a jury trial. This would not be true in the NRS Chapter 125, divorce-like action we have going here. I wonder in this case how the trial court would have reacted to a jury demand by Max.

purpose of community property law. The legislature has accorded benefits, obligations, and protections to persons who have complied with the formal requirements of marriage. As noted by the California Supreme Court: "Formally married couples are granted significant rights and bear important responsibilities toward one another which are not shared by those who cohabit without marriage." Elden v. Sheldon, 758 P.2d 582, 587 (Cal. 1988). I believe that we are constrained by our legislature's clear policy favoring formal marriage not to accord the same (or greater) protections to unmarried cohabitants that are accorded married individuals and that to do so constitutes judicial overreaching of a clear legislative purpose.

I am strongly opposed to opening up our divorce courts to unmarried persons. The trial court was absolutely wrong to decide this case under our Marriage and Dissolution statute and, in a divorce-like decree, to divide a judicially-created, new species of property, "community-property-by-analogy." My disposition of this case would be to reverse the trial court decree and return the case to the trial court where, because of the strange way that this case has been handled, I would allow Lois to file a new complaint to state a contract claim if she has one. Lois is entitled to recover under *Hay* if she can prove, by a preponderance of evidence, that Max agreed to share with her the income and property that he acquired while he and Lois were living together.

