RICHARD S. GILMAN, Appellant, *v.*
MARJORIE GILMAN, Respondent.

No. 27896

KENNETH CALLAHAN, Appellant, *v.*
VALERIE CALLAHAN, Respondent.

No. 28892

April 9, 1998 956 P.2d 761

[Rehearing denied July 21, 1998]

*Daniel Marks,* Las Vegas, for Appellant Gilman.

*Joseph W. Houston, II,* Las Vegas, for Appellant Callahan.

*Davidson & Myers,* Las Vegas, for Respondent Gilman.

*Jolley, Urga, Wirth & Woodbury* and *Kathryn Stryker Wirth,* Las Vegas, for Respondent Callahan.

418

# OPINION

By the Court, SHEARING, J.:

*Docket No. 28892*

Appellant Kenneth Callahan ("Ken") and respondent Valerie Callahan ("Valerie") married on December 31, 1984. Shortly after the wedding, Valerie apparently quit her job as a secretary to stay at home. The parties agreed that Valerie would stay home permanently following the birth of their daughter in 1988 or

1989. Ken earned $125,000 in 1992 and $110,000 in 1993 in his position as a mortgage lender.

On July 31, 1992, Valerie filed a complaint for divorce in Clark County. Beginning in November 1992, she received $500 in temporary spousal support every other week pursuant to a court order. On July 27, 1994, the district court increased this amount to $700 biweekly.

After a three-day divorce trial in September 1994, the district court issued an order increasing Valerie's spousal support to $2,000 per month for twenty-four months, then to $1,500 per month for the following thirty-six months. The court found that Valerie had given up her career to raise the couple's child, that Ken had more than twenty-five years experience in his profession, and that Valerie's earning capabilities would never approximate those of Ken. The separate divorce decree approved by the court states that Ken's obligation to pay spousal support shall terminate upon his death or Valerie's remarriage. There is no reference to cohabitation.

After entry of the divorce decree, Valerie and her daughter moved to Reno with Chuck Maraden ("Chuck"). On March 28, 1996, Ken filed a motion to modify the decree of divorce to, *inter alia,* terminate spousal support based upon the allegation that Valerie and Chuck were cohabiting and "acting in every way as if they were married except the legal solemnization of the marriage." Ken argued that this cohabitation constituted a change of circumstances under NRS 125.150.

On April 30, 1996, at a hearing on the motion, Valerie admitted that she was romantically involved with Chuck and cohabitated with him, but stated that he did not support her financially. She also declared that she shared monthly living expenses with Chuck, that she paid for all of her daughter's expenses, that Chuck had loaned her money, that she had signed promissory notes for the loans, and that Ken had failed to meet his financial obligations to her. The record shows that Ken's gross monthly income in 1996 was $6,500.

On May 14, 1996, the district court issued an order denying Ken's motion to terminate alimony. Ken filed a timely notice of appeal from the May 14 order.

*Docket No. 27896*

Appellant Richard S. Gilman ("Richard") and Marjorie Gilman ("Marjorie") married in Brighton, Massachusetts on April 25, 1963. During the marriage, Richard worked as a certified public accountant and Marjorie remained at home. In 1989, Richard's annual salary was approximately $60,000.

On August 7, 1989, Richard filed for divorce in Clark County district court. On November 26, 1990, the district court approved the decree of divorce negotiated by the parties. The decree states that "[s]pousal support shall terminate upon the death or remarriage of [Marjorie] and the court will consider the issue of spousal support in the event of co-habitation by [Marjorie] with an adult male who significantly contributes to her support." Richard agreed to pay spousal support of $1,500 per month.

From some time in 1991 until November 1993, Marjorie lived off and on in Las Vegas with her friend-boyfriend, Tom Westmoreland ("Tom"), at Tom's house. From April or May 1993 until November 1993, Marjorie lived full-time with Tom, paid him $400 per month in rent and paid for her telephone bill and some of the food bill. Thereafter, Marjorie and Tom moved to Massachusetts. Marjorie purchased a house, making a down payment with money she received from the sale of the Las Vegas marital residence she shared with Richard. The title to the Massachusetts house is in Marjorie's name alone; Tom has no ownership interest in it. Since November 1993, Tom has been living in the Massachusetts house with Marjorie.

By the time of her deposition in March 1994, Marjorie had been unable to secure a job in Massachusetts. She also had no immediate plans to continue a job search.

In addition to the spousal support, Marjorie also receives $4,000 to $8,000 per year in payments from an irrevocable family trust established for the benefit of herself, her parents, and her siblings.

In early 1994, Tom began working full time in a car dealership making $8.00 per hour. Prior to that, Tom was either collecting unemployment or working odd jobs. Tom does not pay rent, food bills, or other living expenses at the Massachusetts house. Apparently, Tom uses his salary to make his car payment and to make payments on the home he owns in Las Vegas. Tom does carpentry work around the house which, according to Marjorie, is a "fair exchange" for the free rent and food. Tom and Marjorie have separate bank accounts; however, they have put both of their names on the two accounts, allegedly for "emergency purposes." Marjorie has loaned Tom small amounts of money on occasion.

By March 1994, Richard's income had increased to $9,325 per month.

On December 6, 1993, Richard filed a motion to terminate his spousal support payment to Marjorie based on changed circumstances. Richard declared in an affidavit that Marjorie had been cohabiting with Tom for two years and that she had "chosen not to remarry to avoid the cohabitation provision [of the divorce

decree]." Richard alleged that these facts were sufficient to warrant termination of spousal support.

On July 25, 1995, the district court denied Richard's motion. The court found that Tom had not significantly contributed to Marjorie's support, that Nevada law contained no presumption that spousal support should terminate if the recipient cohabits with another person, and that legal termination of spousal support would arise only upon death of one of the parties or remarriage of the recipient spouse. The court also noted that parties to a divorce "are free to impose whatever conditions they wish to define the term of alimony." Richard has appealed the district court's decision denying his motion to terminate alimony.

## DISCUSSION

Richard and Ken contend that cohabitation constitutes a changed circumstance under NRS 125.150, particularly where the cohabitant's finances have any effect, positive or negative, upon the recipient spouse's finances.[1] Thus, they contend that the district court erred in refusing to modify or terminate spousal support in their respective cases.[2]

Both Marjorie and Valerie concede that financial contributions by a cohabitant might constitute a change of circumstances under NRS 125.150. However, Marjorie argues that the express provisions of her divorce decree should control and that Richard failed to make a showing that Tom significantly contributed to her support. Valerie argues that she presented ample evidence that her financial condition did not improve, and even worsened, during her cohabitation and thus that no changed circumstances occurred.

---

[1] Citing out-of-state decisions, Richard also contends that a long-term relationship, such as that between Marjorie and Tom, constitutes remarriage for purposes of terminating spousal support. However, this court has held that cohabitation does not amount to a "de facto marriage" because Nevada does not recognize common law marriages. Watson v. Watson, 95 Nev. 495, 496, 596 P.2d 507, 507 (1979). Moreover, the term "remarriage," as used in divorce decrees and NRS 125.150(5), means the "solemnization or ceremony or remarriage." Shank v. Shank, 100 Nev. 695, 697, 691 P.2d 872, 873 (1984). Here, there is no evidence that Marjorie and Tom legally married. Accordingly, we conclude that this contention is without merit.

[2] Citing California Family Code § 4323 (1994), Richard contends that cohabitation raises a rebuttable presumption of decreased need for spousal support which must be overcome by the person who receives the support. The Nevada legislature has had the opportunity to create such a presumption, but has not done so. We conclude that creating such an important substantive presumption is a matter for the legislature.

NRS 125.150 provides, in relevant part:

> 7. If a decree of divorce . . . provides for specified periodic payments of alimony, the decree or agreement is not subject to modification by the court as to accrued payments. Payments . . . which have not accrued at the time a motion for modification is filed may be modified upon a showing of changed circumstances, whether or not the court has expressly retained jurisdiction for the modification.

This court reviews a district court's ruling on a motion to modify spousal support for an abuse of discretion. DuBois v. DuBois, 92 Nev. 595, 595, 555 P.2d 839, 839 (1976).

The current majority rule regarding the effect of post-divorce cohabitation on spousal support, at least in jurisdictions where no specific statute covers that situation, appears to be that the right to receive spousal support becomes subject to modification or termination only if the recipient spouse's need for the support decreases as a result of the cohabitation. Gayet v. Gayet, 456 A.2d 102, 104 (N.J. 1983); *see also* Wendy S. Ricketts, *The Relevance of Premarital and Postmarital Cohabitation in Awarding Spousal Support,* 7 *Divorce Litigation* 150, 154 (1995); Annotation, *Divorced Woman's Subsequent Sexual Relations or Misconduct as Warranting, Alone or With Other Circumstances, Modification of Alimony Decree,* 98 A.L.R. 3d 453 (1980 & Supp. 1996). Most jurisdictions following the majority rule have determined that some financial dependence by the alimony recipient upon the third-party cohabitant likely warrants a reduction in spousal support. *See Gayet,* 456 A.2d at 104; Ricketts, *supra,* at 154. Similarly, those jurisdictions also hold that alimony payments used to benefit the cohabitant should be eliminated or reduced to meet the recipient spouse's actual needs. *See, e.g.,* In re Marriage of Tower, 780 P.2d 863, 866-67 (Wash. Ct. App. 1989). As stated by the New Jersey Supreme Court: "modification [of spousal support] for changed circumstances resulting from cohabitation [is warranted] only if one cohabitant supports or subsidizes the other under circumstances sufficient to entitle the supporting spouse to relief." *Gayet,* 456 A.2d at 104.

Under this "economic needs" test, the amount of spousal support reduction, if any, depends upon a factual examination of the financial effects of the cohabitation on the recipient spouse. *See* Ricketts, *supra,* at 154. Shared living arrangements, unaccompanied by evidence of a decrease in the actual financial needs of the recipient spouse, are generally insufficient to call for

alimony modification. *See* In re Marriage of Bross, 845 P.2d 728, 731-32 (Mont. 1993); *see also* Mitchell v. Mitchell, 418 A.2d 1140, 1143 (Me. 1980) (noting, for example, that a cohabitant's benefit from a recipient spouse's expenditures on heating fuel, which would have a similar cost absent the shared living arrangements, does not show a decreased need for alimony).

The economic needs test properly considers the rights and needs, both fiscal and personal, of payor and recipient spouses. First, the test does not unduly impinge upon an individual's freedom to choose to cohabit. Rights to spousal support are not rescinded merely because the recipient spouse is cohabiting.[3]

Second, the test also recognizes the fact that a recipient spouse may be left largely unprotected, from an economic standpoint, if he or she breaks off a relationship with a cohabitant. The Nevada legislature created spousal support awards to, *inter alia,* keep recipient spouses off the welfare rolls. *Cf.* Fondi v. Fondi, 106 Nev. 856, 863 n.5, 802 P.2d 1264, 1268 n.5 (1990). Modifying or terminating spousal support payments based upon cohabitation may be inconsistent with this purpose. *See generally In re Marriage of Tower,* 780 P.2d at 866. Generally, cohabitants owe no legal or financial support to one another. *See* In re Marriage of Dwyer, 825 P.2d 1018, 1019 (Colo. Ct. App. 1991). Because no legal support obligation is imposed on the parties during the relationship, no spousal maintenance can be awarded when and if the relationship ends. *See generally* Smith v. Mangum, 747 P.2d 609, 611 (Ariz. Ct. App. 1987). Moreover, absent an express or implied agreement to the contrary, no quasi-marital property rights accrue as a result of cohabitation. *Id.*

Third, the test also takes into consideration the financial rights of the payor spouse, as well as the economic realities associated with cohabitation. As some courts and commentators have suggested, a possibility exists that cohabitants may sometimes act improperly to maximize their joint wealth (and retain any spousal support payments) by appearing to maintain "separate financial identities." *See* In re Marriage of Schroeder, 238 Cal. Rptr. 12, 15 (Ct. App. 1987). Moreover, sharing household expenses gives

---

[3]Some jurisdictions, by statute or judicial decision, require elimination of spousal support upon a showing of post-divorce cohabitation. For a list of those jurisdictions, see Spector v. Spector, 112 Nev. 1395, 1396 n.2, 929 P.2d 964, 965 n.2 (1996), and *Gayet,* 456 A.2d at 103-04. Others have concluded that the mere fact of cohabitation is a proper factor for the court to consider in the changed circumstances assessment. See those cases cited in Alibrando v. Alibrando, 375 A.2d 9, 13-14 (D.C. 1976). We reject this law and conclude that cohabitation per se is insufficient to require a modification or termination of spousal support without an associated change in financial circumstances.

rise to "economies of scale" which may permit cohabitants to spend less living together than individually. *See id.* (citing Grace Ganz Blumberg, *Cohabitation Without Marriage, A Different Perspective,* 28 UCLA L. Rev. 1125, 1150 (1981)). The economic needs test recognizes these situations and promotes fiscal fairness by acknowledging that maintaining the original amount of spousal support payments may be unfair to payor spouses if they are essentially subsidizing third party cohabitants, or supporting ex-spouses who have significantly improved their financial situations. *See In re Marriage of Tower,* 780 P.2d at 866.

We conclude that the economic needs test fairly balances the rights of payor and payee spouses by permitting modification or termination of spousal support solely when financial circumstances so merit. The test coincides with Nevada's existing statutory "changed circumstances" scheme and allows lower courts to focus upon the specific facts of each case, while retaining their substantial discretion when making spousal support modification decisions.

Our holding in Jackson v. Jackson, 111 Nev. 1551, 907 P.2d 990 (1995), supports our adoption of the economic needs test. There, in a case involving a motion to increase a child support obligation, we held that "insofar as a parent's expenses are affected by a cohabitant's contributions to rent and other household payments, the district court may take this circumstance into account when setting or modifying child support [and determining the relative income of the parties]." *Id.* at 1555, 907 P.2d at 993. Thus, we have previously indicated that the financial support provided by cohabitants should be considered when modifying court-imposed or court-ratified support obligations.

Accordingly, we hold that a showing that the recipient spouse has an actual decreased financial need for spousal support due to the fiscal impact of a cohabitant may constitute changed circumstances sufficient to require a modification of unaccrued payments under that support obligation.[4]

---

[4]While we agree in general terms with the *Gayet* decision, we cannot adopt wholesale the implication that modification of a spousal support award is absolutely warranted where the third party contributes anything to the recipient spouse's support. 456 A.2d at 103. Certainly, situations may arise where the third party makes a minimal contribution to the recipient spouse's support which has little or no impact on the recipient spouse's actual needs. For that reason, we emphasize that district courts retain their discretion to examine the facts and circumstances of each individual case.

*Docket No. 28892*

Valerie and Ken's divorce decree contains no cohabitation provision. According to Valerie, she and her daughter moved from Las Vegas to Reno with Chuck in the fall of 1995, and all three currently live together. The record shows that, on October 1, 1995, Valerie and Chuck entered into a "rental agreement." Valerie promised to pay Chuck $1,000 per month to cover rent and household expenses. In 1996, Valerie was unable to pay this amount for several months. She also borrowed other monies from Chuck, apparently because Ken failed to timely pay spousal and child support and to timely turn over previously divided marital assets. Under these circumstances, we conclude that the district court did not abuse its discretion in determining that Ken did not show that Chuck's contributions to Valerie were significant enough to warrant termination, or even modification, of spousal support. Ken presented virtually no evidence which indicates that Valerie's actual financial needs have been reduced because of her living arrangements. Accordingly, Ken's contention is without merit.

*Docket No. 27896*

Richard and Marjorie's divorce decree states that "the court will consider the issue of spousal support in the event of cohabitation by [Marjorie] with an adult male who significantly contributes to her support." We conclude that the district court correctly determined that the parties were free to place that cohabitation provision in their divorce decree and that the provision is valid and enforceable. *See* Spector v. Spector, 112 Nev. 1395, 1396-97, 929 P.2d 964, 965 (1996); *Watson*, 95 Nev. at 496, 596 P.2d at 507 (holding that courts are bound by contractual language which is readily understood and unambiguous).

The record shows that Tom earned approximately $320 per week working at a car dealership. Tom used the money he made to make the payment on a house he owns in Las Vegas and on his car. Tom does not pay for rent, food, or other household bills at the Massachusetts residence. He performs carpentry work around the house as a "fair exchange" for rent and food. Tom and Marjorie keep separate bank accounts. When Marjorie and Tom lived together full-time in Tom's Las Vegas home, Marjorie paid her share of the rent and household bills. Thus, there is no evidence that Tom ever "significantly contributed" to Marjorie's support.

Richard contends that his spousal support payments to Marjorie should be reduced or terminated because Marjorie is using those funds to support Tom.

Under well settled rules of contract construction, a court has no power to create a new contract for the parties which they have not created or intended themselves. Old Aztec Mine, Inc. v. Brown, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981). Parties are presumed to contract with reference to existing statutes. Wagner v. Wagner, 621 P.2d 1279, 1282 (Wash. 1980). Applicable statutes will generally be incorporated into the contract; however, other legal principles may govern the legal relationship where they are expressly set forth in the contract. *Id.* Indeed, "when parties to a contract foresee a condition which may develop and provide in their contract a remedy for the happening of that condition, the presumption is that the parties intended the prescribed remedy as the sole remedy for that condition." S.L. Rowland Const. Co. v. Beall Pipe & Tank Corp., 540 P.2d 912, 920 (Wash. Ct. App. 1975) (citations omitted).

Here, the parties negotiated for the cohabitation provision contained in the divorce decree. That provision fails to address what would happen if Marjorie used her alimony payments to support Tom. In light of the existence of that term, we conclude that the parties intended their contractual cohabitation provision, and not the general "changed circumstances" statute, to apply in case of Marjorie's cohabitation with another man. *See Brown,* 97 Nev. at 52, 623 P.2d at 983; *Wagner,* 621 P.2d at 1282; *S.L. Rowland Const. Co.,* 540 P.2d at 920. Accordingly, we decline to apply NRS 125.150(7) and the economic needs test to this situation. Thus, Richard cannot allege that Tom's failure to pay a share of household bills at the Massachusetts residence is a valid basis for modifying or terminating Marjorie's alimony award. We conclude that the district court did not abuse its discretion in refusing to modify or terminate the spousal support in this case.

In both the Gilmans' and the Callahans' cases, the district courts considered the cohabitation as it affected the economic situation of the parties receiving spousal support and concluded that no change in the support orders was warranted. Their conclusions were not only not abuses of discretion, but were clearly justified based on the evidence presented.

In no way is either of the cases similar to the circumstances in Western States Construction v. Michoff, 108 Nev. 931, 840 P.2d 1220 (1992). The *Michoff* case was one in which the cohabiting parties built and developed a business together based on an

implied agreement of coequal ownership. The woman was an integral part of the business, even being listed as sole owner for a time in order to increase the chances of getting contracts. They held themselves out as husband and wife, even filing joint tax returns and designating their holdings as community property. It would certainly have been inequitable not to enforce the agreement of the parties for coequal ownership, allowing the woman to receive her share of their assets, when the relationship ended. The cohabitation element of the relationship was virtually incidental.

The situation with both the Gilmans and the Callahans is not even remotely similar. There is certainly no evidence of a contract between the cohabitants which was the basis for *Michoff*. There is no evidence of pooling of assets or holding themselves out as husband and wife or treating their assets as community property or building a business together. It should be clear that neither cohabitation nor a romantic relationship is the real basis for the *Michoff* holding, and that is all that is present in both the Gilman and Callahan situations.

The district courts appropriately exercised their discretion, and their orders are affirmed.

ROSE, YOUNG, and MAUPIN, JJ., concur.

SPRINGER, C. J., concurring in part and dissenting in part:

I concur in the *Gilman* case and dissent in the *Callahan* case.

The reason that I agree with the judgment in the *Gilman* case is that the family court properly applied the agreed-upon standard for modifying support, namely, whether the person with whom Marjorie was cohabiting "significantly" contributed to her support. In accordance with the agreement of the parties, the court simply ruled that the "adult male" with whom Marjorie was cohabiting did not "significantly contribute" to her support and that, therefore, Richard was not entitled to relief. The court was acting well within its discretion when it ruled that there was not such a significant contribution as to justify a modification; so I would affirm the family court's judgment in the *Gilman* case.

I dissent in *Callahan* because, absent the kind of negotiated agreement present in *Gilman,* the family court had to apply general principles of law in deciding whether modification was justified. In my opinion, it was error for the family court to ignore the fact that Valerie had been living for a time with "Chuck," with whom she was "acting in every way as if they were married except the legal solemnization of the marriage." The family court ruled that this marriage-like "cohabitation was not a fact that [the court] was considering would warrant termina-

tion of spousal support." The majority opinion agrees with the family court's judgment in this regard. In my opinion, this kind of "marriage-like" relationship should not only be *considered* by the family court, it should create a rebuttable presumption of a change in circumstances.

When a man and woman live together "as if they were married" they create a legally-cognizable status, a status that might, in Nevada, be properly called a "Michoff[1] marriage." A Michoff marriage is created when two people cohabit in such a way as to entitle either party to make claims against the other for "palimony" and for community property "by analogy." Michoff marriages are a creature of *Michoff*, which allows "inter-cohabitant" claims to be made based upon a supposed "implied contract" that is created by virtue of the cohabitation. It is my position that an alimony-receiving ex-spouse cannot "have it both ways"—that is, cannot put himself in a position where he is entitled to receive palimony and property division by virtue of a Michoff marriage and also be entitled to continue to receive alimony from a former spouse.

I argue in this dissent that, at the very least, a rebuttable presumption of disentitlement to continued alimony should follow from a Michoff marriage and, further, that there are persuasive reasons for concluding that the presumption should be irrebuttable in cases where an alimony-receiving spouse's claim to palimony has matured by reason of ripening support and property rights attendant to a Michoff marriage. I dissent because the common law of this state, per *Michoff*, 108 Nev. at 938, 840 P. 2d at 1124, requires that the marriage-like status created by "as-if-they-were-married" cohabitation, of itself must be seen as "changed circumstances" that must, at the very least, be *considered* by the family court in any alimony modification proceeding.

It should be kept in mind that the words "cohabitation" and "cohabiting" are words of particular legal significance that carry more meaning than merely living under the same roof. Merely living with a person of the opposite sex does not constitute cohabitation. In re Marriage of Thweatt, 157 Cal. Rptr. 826 (Cal. Ct. App. 3d 1979). To be cohabitants, it is not necessary that the cohabiting parties hold themselves out as husband and wife. *Id.* at 828. To be "cohabiting," the parties must be engaged in a romantic or homemaker-companion relationship that resembles the marital relationship, but without a formal marriage ceremony. *Id. Michoff* recognizes the "cohabiting" status that arises out of one's being an "unmarried cohabitant[]" and recognizes the right of one unmarried cohabitant to sue the other in family court,

---

[1]Western States Constr. v. Michoff, 108 Nev. 931, 840 P.2d 1220 (1992).

"seeking one-half of the parties' assets." 108 Nev. at 933, 840 P.2d at 1221. In *Michoff,* this court ruled that "the remedies in *Marvin*[2] are available to unmarried cohabitants" and that, accordingly, "adults who voluntarily live together," in addition to acquiring rights to be supported by the other cohabitant (facetiously called "palimony"), may acquire property rights "during the relationship in accord with the law governing community property." *Michoff,* 108 Nev. at 938, 840 P.2d at 1224.

According to *Michoff,* the laws of spousal support and "the community property laws of the state will apply by analogy," at some stage of extra-marital cohabitation. *Id.* (quoting Hay v. Hay, 100 Nev. 196, 199, 678 P.2d 672, 674 (1984)). The *Michoff* right of an unmarried cohabitant to "seek[] one-half of the parties' assets" rests on the parties' having cohabited and thereby "impliedly agreed to hold their property as though they were married." *Id.* at 938, 840 P.2d at 1224. Although *Michoff* did not deal with palimony, because it expressly adopted *Marvin,* Michoff cohabitants are in a position to prove a case that would entitle them to recover both palimony as well as "one-half of the [other] part[y's] assets." My point is that Michoff cohabitants become vested with a right to sue for support and property distribution benefits, and Michoff status necessarily has a significant bearing on the alimony-paying spouse's obligation to support a former, but now "cohabiting," spouse. It cannot be denied that Michoff cohabitation gives rise to claims of implied agreements to support and for property division at the termination of the cohabitation; thus, under *Michoff,* when "adults voluntarily live together," each is placed in a position in which he or she is entitled to make legally-enforceable claims for support from the other and to make claims for "one-half of the parties' assets." Michoff cohabitations create a special legal status that possesses certain, defined rights and liabilities that cannot be ignored.

As I have indicated above, cohabitation has been judicially recognized as being a status-creating condition. In In re Marriage of Leib, 145 Cal. Rptr. 763 (Cal. App. 3d 1978), the court recognized that cohabitation establishes a status and that such a status provides a benefit or at least a potential benefit to each of the cohabiting spouses. The *Leib* court thus ruled that such status, therefore, creates a change of circumstances so tied in with payment of spousal support as to be significant enough by itself to require a "re-examination" of the issue of whether a former spouse should be required to continue to support her now-cohabiting ex-spouse.

The majority opinion tells us that "[a]fter entry of the divorce

---

[2]Marvin v. Marvin, 557 P.2d 672 (Cal. 1984).

decree [September, 1994], Valerie . . . moved to Reno with Chuck Maraden ("Chuck")." Further, "Valerie admitted that she was romantically involved with Chuck and cohabited with him . . . ." We know that the two were cohabiting "as if they were married" in May of 1996 when Ken's motion to modify alimony was denied, and there is no reason to suspect that they are not cohabiting at this time, the point being that Valerie and Chuck are engaged in the relatively permanent marriage-like cohabitation that, by its nature, necessarily gives rise to the status I have referred to as a Michoff marriage. Under these circumstances, it cannot be denied that each partner to the Michoff marriage is in a position to sue the other in family court for *Michoff/Marvin*-sanctioned support payments and for "one half of the parties' assets" in the form of "community property by analogy." *Michoff,* 108 Nev. at 933, 840 P.2d at 1221.

I appreciate the majority's reluctance, in the absence of a statute,[3] to create any kind of legal presumption arising out of a Michoff marriage, but in my opinion, a Michoff marriage, by the very terms of the *Michoff* case, creates a presumption of changed circumstances because to say otherwise would be to say that a spouse is entitled to the benefits of two marriages, a former marriage and the later, Michoff marriage. A Michoff "spouse" is, "presumably," in a position to lay claim to the right to support and to equal property division of all property acquired during the Michoff marriage. As put in *Leib,* this is "enough by itself to require a re-examination" of whether a former spouse should have to continue to support a divorced spouse who has elected to engage in a Michoff marriage. *Leib,* 145 Cal. Rptr. at 771.

I argue that, *at the very least,* some judicial cognizance must be given to Michoff marriages in support modification cases; and it would not be too difficult to argue, further, that since no one is entitled to *two* alimony claims, establishment of a Michoff marriage should terminate all previous rights to receive alimony. It certainly makes some sense to argue that a Michoff marriage should be an absolute bar to receiving alimony from a previous spouse. A Michoff bride or groom should not be able to have it both ways—to have the right to palimony plus one-half of the analogous community property from a current cohabitant on top of having the right to receive alimony payments from a former, divorced spouse. I do not intend to pursue this argument, however, and will be content to maintain that we should follow California law and presume that cohabitation, a Michoff mar-

---

[3]California has enacted a statute that codifies its common law and creates a "rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a person of the opposite sex." Cal. Fam. Code § 4323 (West 1994).

riage, of itself, constitutes changed circumstances for alimony-modification purposes. Perhaps, in today's world, the majority opinion may be right in recognizing an "individual freedom to choose to cohabit"; still, I do not believe that we would "impinge" on that right if we refused to permit a person to be entitled to two alimonies.

I agree with *Leib* that Michoff cohabitation gives rise to a need for a close "re-examination" of a former spouse's duty to continue to make "spousal support" payments.[4] In my opinion, the family court erred in ruling that cohabitation was not a fact that should be considered in proceedings seeking termination or modification of alimony. I would reverse the judgment of the family court and remand with instructions that proof of a Michoff marriage creates a rebuttable presumption of changed circumstances and entitlement to termination or modification of alimony payments being made to a Michoff spouse.

---

[4] I think that it is worth noting that the majority's relying "solely" on the financial needs of the alimony-receiving party in alimony modification proceedings ignores the true purpose of alimony and runs contrary to the public policy goal of promoting lawful marriages. The purpose of alimony is to maintain the standard of living that the recipient had enjoyed during the marriage. After remarriage, the recipient has no claim against a former spouse for such maintenance. If we were to allow alimony recipients to continue to receive alimony after remarriage, it would be allowing the alimony recipient to accrue benefits of marriage from multiple partners. It seems to me that the present decision, allowing a participant in a Michoff marriage to continue to receive alimony from a former spouse, could create a form of financial polygamy, thus providing a powerful disincentive for lawful marriage. This gives strength to the argument that a Michoff marriage should create an unrebuttable presumption that previous alimony rights should be terminated once a Michoff marriage has been established. The majority appears not to be aware of the problems that inhere in the status created by a Michoff marriage; and I should expect that due consideration be given by the court to the overall consequences of a Michoff marriage. For example, one wonders if, by continuing to receive alimony, Ms. Callahan-Maraden waived her right to palimony and to one-half of the pseudo-community property arising out of her Michoff marriage. As things stand, no one knows the consequences of a Michoff marriage (other than that it creates by "implied contract" rights in extra-marital cohabitants to sue each other in family court for palimony and one-half of the "community property by analogy"). *Michoff*, obviously, has created a mess; and I think it is incumbent upon the majority to clean up this mess. It has not done so and, in my opinion, has made matters worse.