**135 Nev., Advance Opinion 9**

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| DENNIS KOGOD,<br>Appellant/Cross-Respondent,<br>vs.<br>GABRIELLE CIOFFI-KOGOD,<br>Respondent/Cross-Appellant. | No. 71147 |
| DENNIS KOGOD,<br>Appellant/Cross-Respondent,<br>vs.<br>GABRIELLE CIOFFI-KOGOD,<br>Respondent/Cross-Appellant. | No. 71994<br><br>**FILED**<br><br>APR 25 2019 |

Consolidated appeals and cross-appeals from a divorce decree and post-divorce decree order concerning attorney fees and costs. Eighth Judicial District Court, Family Court Division, Clark County; Bryce C. Duckworth, Judge.

*Affirmed in part, reversed in part, and remanded with instructions.*

Law Office of Daniel Marks and Daniel Marks and Nicole M. Young, Las Vegas,
for Appellant/Cross-Respondent.

Radford J. Smith, Chartered, and Radford J. Smith and Garima Varshney, Henderson,
for Respondent/Cross-Appellant.

BEFORE THE COURT EN BANC.

19-18121

*OPINION*

By the Court, PICKERING, J.:

This is a divorce action with a $47 million community property estate, in which the district court awarded alimony not based on need and also unequally distributed the parties' community property due to one spouse's extramarital affairs, gifts to family, and excess spending. In this opinion, we recognize that alimony can be just and equitable even when not based on financial need, but we reverse the alimony award in this case because the receiving spouse's share of community property will produce passive income sufficient to maintain her marital standard of living. We also hold that community funds spent on extramarital affairs are dissipated such that the district court has a compelling reason to make an unequal disposition of community property. Finally, this opinion addresses whether monetary sanctions were appropriate for expenditures in violation of the automatic joint preliminary injunction ordering the parties not to spend money outside the usual course of business; whether expert witness and attorney fees were warranted; and when a community property estate properly ends. We affirm in part, reverse in part, and remand.

I.

Dennis Kogod and Gabrielle Cioffi-Kogod married in 1991 in New York City. They lived in various cities throughout their marriage, moving each time to advance Dennis's career in the healthcare industry. In 2003, Dennis and Gabrielle moved to Las Vegas. Dennis worked for a healthcare company based in southern California and Gabrielle worked part-time in Las Vegas as a nurse consultant. Dennis traveled frequently for work and spent his weekdays either traveling or at his office in southern California. He spent most weekends with Gabrielle in Las Vegas.

Dennis and Gabrielle considered themselves upper-middle class until 2004, when Dennis took a more senior role at his company. By 2009, Dennis was promoted to Chief Operating Officer of a Fortune 500 healthcare company. With his new promotion, he earned an average base salary of $800,000 per year, but received bonuses that put his average annual income at almost $14,000,000. Gabrielle, as a part-time nurse consultant, earned approximately $55,000 per year. Dennis describes this time period after he and Gabrielle moved to Las Vegas as one in which they were essentially living separate lives, but Gabrielle disputes Dennis's characterization and claims that they spoke every day, sometimes multiple times a day.

Unknown to Gabrielle, Dennis had started a separate family in southern California. He met Nadya in November 2004 and by June 2005 they participated in a wedding-type ceremony in Mexico. Shortly after, Dennis informed Nadya he was already married. Despite this, Dennis and Nadya remained together and, after participating in in-vitro fertilization, had twin girls in 2007. Dennis paid for all of Nadya's and his daughters' expenses, including a condominium in southern California, luxury cars, shopping trips and vacations, cosmetic surgery, and Nadya's college classes—he even invested in a business on Nadya's behalf. Dennis and Nadya remained together until 2015 when Nadya discovered that Dennis had another girlfriend.

Dennis initially filed for divorce from Gabrielle in 2010, but the action was dismissed and the couple instead became informally separated as of July 2010. Gabrielle then filed this divorce action in December 2013, at which time she still did not know about Dennis's extramarital family. Had Dennis and Gabrielle divorced in 2010 when they informally separated,

just one year after Dennis was promoted to COO, the marital estate would have been significantly smaller than the approximately $47 million ultimately divided by the district court.

The district court entered its divorce decree in August 2016. Because the district court previously awarded more than $6 million to each Gabrielle and Dennis as separate property throughout the divorce proceedings, $35 million of community property remained in the marital estate. Due to Dennis's expenditures on extramarital affairs, gifts to his family during the divorce proceedings, and spending in excess of his self-declared expenses, the district court found that Dennis dissipated $4,087,863 in community property and unequally divided the parties' community property on that basis. The district court also awarded Gabrielle alimony in the lump sum of $1,630,292 to compensate for economic losses as a result of the marriage and divorce, but recognized that she did not need alimony to support herself. In total, Gabrielle, 58 years old, received nearly $21 million in the divorce decree and Dennis, 57 years old, received just under $14 million. Gabrielle received mostly cash assets, which she does not contest can passively earn her between $500,000 and $800,000 per year, whereas Dennis's assets largely consist of real property.

In addition to the unequal disposition of community property and the alimony award, the district court sanctioned Dennis $19,500 for purported violations of an automatic joint preliminary injunction and awarded $75,650 in expert witness costs to Gabrielle to pay for the forensic accounting firm that analyzed over 27,200 of her and Dennis's financial transactions from between 2008 and 2016. Dennis appealed from the district court's orders, and Gabrielle cross-appealed.

## II.

Dennis first challenges the award of alimony to Gabrielle. Permanent alimony is financial support paid from one spouse to the other for a specified period of time, or in a lump sum, following a divorce. NRS 125.150(1)(a); *Rodriguez v. Rodriguez*, 116 Nev. 993, 999, 13 P.3d 415, 419 (2000) ("Alimony is financial support paid from one spouse to the other whenever justice and equity require it."). When granting a divorce, a district court may award alimony to either spouse "as appears just and equitable." NRS 125.150(1)(a). The decision of whether to award alimony is within the discretion of the district court. *Buchanan v. Buchanan*, 90 Nev. 209, 215, 523 P.2d 1, 5 (1974) ("In determining whether alimony should be paid, as well as the amount thereof, courts are vested with a wide range of discretion.").

When determining if alimony is just and equitable, a district court must consider the eleven factors listed in NRS 125.150(9).[1] *See*

---

[1]NRS 125.150(9) provides:

> In addition to any other factors the court considers relevant in determining whether to award alimony and the amount of such an award, the court shall consider:
>
> (a) The financial condition of each spouse;
>
> (b) The nature and value of the respective property of each spouse;
>
> (c) The contribution of each spouse to any property held by the spouses pursuant to NRS 123.030;
>
> (d) The duration of the marriage;
>
> (e) The income, earning capacity, age and health of each spouse;

*DeVries v. Gallio*, 128 Nev. 706, 711-13, 290 P.3d 260, 264-65 (2012). The district court may also consider any other relevant factor, but it must not consider the marital fault or misconduct, or lack thereof, of the spouses. *Rodriguez*, 116 Nev. at 999, 13 P.3d at 419 ("Alimony is not a sword to level the wrongdoer. Alimony is not a prize to reward virtue.").

NRS 125.150(9)'s authorization to award alimony as appears just and equitable is amorphous and does not explain the purpose of alimony. *See* David A. Hardy, *Nevada Alimony: An Important Policy in Need of a Coherent Policy Purpose*, 9 Nev. L.J. 325, 330 (2009) ("Nevada does not provide a coherent policy rationale for why, when, and how alimony should be awarded."); Robert Kirkman Collins, *The Theory of Marital Residuals: Applying an Income Adjustment Calculus to the Enigma of Alimony*, 24 Harv. Women's L.J. 23, 23 (2001) ("Statutes simply list factors for trial courts to consider without providing any guidance as to how the judge should weigh or apply them."). Leaving the purpose of alimony

(f) The standard of living during the marriage;

(g) The career before the marriage of the spouse who would receive the alimony;

(h) The existence of specialized education or training or the level of marketable skills attained by each spouse during the marriage;

(i) The contribution of either spouse as homemaker;

(j) The award of property granted by the court in the divorce, other than child support and alimony, to the spouse who would receive the alimony; and

(k) The physical and mental condition of each party as it relates to the financial condition, health and ability to work of that spouse.

nebulous makes alimony awards unpredictable for parties and their attorneys, and leaves courts uncertain as to when, and in what amount, alimony should be awarded. Marshal Willick, *In Search of a Coherent Theoretical Model for Alimony*, Nev. Law., Apr. 2007, at 41 (noting that alimony is "the last great crapshoot in family law" because "it is a category of remedy without any substantive underlying theoretical rationale").

The parties' arguments in this case highlight the undefined nature of alimony awards. Dennis argues that a judge's discretion to award alimony is limited to instances of financial need, and that no Nevada case or statute extends alimony beyond financial need. Gabrielle responds that alimony may be awarded to equalize post-divorce earnings or maintain the marital standard of living, regardless of need. Our previous cases often addressed alimony without discussing its purpose or scope in express terms. But after examining the historical underpinnings of alimony and our prior case law, we now hold that alimony can be "just and equitable" both when necessary to support the economic needs of a spouse and to compensate for a spouse's economic losses from the marriage and divorce, including to equalize post-divorce earnings or help maintain the marital standard of living.

### A.

Alimony, in its most elementary form, is based on the receiving spouse's need and the paying spouse's ability to pay. When alimony originated in England, a woman's legal rights, including ownership of property and the ability to work and keep her wages, were subsumed by her husband under the doctrine of coverture. *See* Collins, *The Theory of Marital Residuals*, 24 Harv. Women's L.J. at 28-29 ("[M]arried women were barred by the doctrine of unity from holding certain property, signing contracts,

working at many professions, or retaining their own earnings when they did work . . . .") (footnotes omitted). And absolute divorce, where the marital relationship was terminated, was exceedingly difficult to obtain. *See id.* Rather than absolute divorce, spouses could seek a "'divorce' from bed and board," where the spouses lived apart without actually terminating the marriage or the wife being released from coverture. *Id.* This meant the husband had an ongoing legal and moral obligation to continue to provide for his wife, despite the "divorce," because she could not support herself. *Id.* at 29; *see also Manby v. Scott* (1663) 86 Eng. Rep. 781, 784 (Exch.) ("[T]he law having disabled the wife to bind herself by contract, therefore the burthen shall rest upon the husband, who by law is bound to maintain her . . . ."). Despite finding its origins in the scarcity of absolute divorce and the law of coverture, courts continued to award alimony even after absolute divorce became available, seemingly out of economic necessity. Collins, *The Theory of Marital Residuals*, 24 Harv. Women's L.J. at 30-31.

Alimony to remedy the economic-power imbalance between husband and wife is recognized in Nevada's earliest cases. *See In re application of Phillips*, 43 Nev. 368, 373, 187 P. 311, 311-12 (1920) (recognizing alimony as "a duty which sound public policy sanctions to compel one who is able so to do, possibly as a result of the cooperation (during coverture) of his former wife, to prevent such former wife from becoming a public charge or dependent upon the charity of relatives or friends"); *see also Wilde v. Wilde*, 2 Nev. 306, 307 (1866) (noting that a married woman's "property is generally entirely under the control of the husband"). Indeed, some cases treat the receiving spouse's need and the paying spouse's ability to pay as the sole alimony determinants. *See, e.g., Applebaum v. Applebaum*, 93 Nev. 382, 386, 566 P.2d 85, 88 (1977)

SUPREME COURT
OF
NEVADA

(O) 1947A

(affirming a denial of alimony where the spouse "had adequate resources with which to support herself"); *Foy v. Estate of Smith*, 58 Nev. 371, 376, 81 P.2d 1065, 1067 (1938) (stating that the right to alimony "is solely that of support"); *Greinstein v. Greinstein*, 44 Nev. 174, 174, 191 P. 1082, 1082 (1920) (affirming an award of alimony where "the wife was without sufficient means, and unable physically to maintain and support herself, and . . . the husband was financially able to pay"); *Lake v. Bender*, 18 Nev. 361, 410, 7 P. 74, 80 (1884), *modified on reh'g* (stating that a court should award alimony based on "the financial conditions of the husband and the requirements of the wife"), *abrogated on other grounds by Johnson v. Johnson*, 89 Nev. 244, 246, 510 P.2d 625, 626 (1973).

NRS 125.150, which authorizes alimony, directs a district court to consider several factors that help the court to understand the spouses' financial needs and abilities to pay. *See* NRS 125.150(9). A district court must consider: "[t]he financial condition of each spouse," NRS 125.150(9)(a); "[t]he nature and value of the respective property of each spouse," (9)(b); "[t]he income, earning capacity, age and health of each spouse," (9)(e); "[t]he award of property granted by the court in the divorce . . . to the spouse who would receive the alimony," (9)(j); and "[t]he physical and mental condition of each party as it relates to the financial condition, health and ability to work of that spouse," (9)(k). After considering these factors, and any other relevant circumstance, our case law makes clear that a district court may award alimony to ensure that an economically powerless spouse receives sufficient support to meet his or her needs. *See Gilman v. Gilman*, 114 Nev. 416, 423-24, 956 P.2d 761, 765 (1998) ("The Nevada legislature created spousal support awards to, *inter alia*, keep recipient spouses off the welfare rolls.").

If a district court awards alimony to address a spouse's financial need, the basis for an award is clear-cut when one spouse is unable to meet the basic necessities of life such as food, clothing, and habitation. But such an award becomes less certain and predictable when the divorced spouse is able to meet his or her basic needs. A court can "reach very different figures for a spouse's 'needs,' depending on whether those needs are measured at a subsistence level, a level that the court believes to be objectively reasonable, or the actual subjective marital standard of living." Brett. R. Turner, *Spousal Support in Chaos*, 25 Fam. Advoc., Spring 2003, at 14, 17. Alimony based on economic necessity, then, requires a policy decision regarding when a divorced spouse's "needs" are met. *See Principles of the Law of Family Dissolution: Analysis and Recommendations* § 5.02 cmt. a (Am. Law Inst. 2002) (hereinafter *Family Dissolution*) ("Some judicial opinions find the alimony claimant in 'need' only if unable to provide for her basic necessities, others if the claimant is unable to support himself at a moderate middle-class level, and still others whenever the claimant is unable to sustain the living standard enjoyed during the marriage even if it was lavish."). As it stands, the Legislature has placed that decision-making power in the hands of district courts to award alimony "as appears just and equitable." NRS 125.150(1)(a).

## B.

In addition to economic need, alimony may also be awarded to compensate for economic loss as the result of a marriage and subsequent divorce, particularly one spouse's loss in standard of living or earning capacity. *See* Mary Kay Kisthardt, *Re-thinking Alimony: The AAML's Considerations for Calculating Alimony, Spousal Support or Maintenance*, 21 J. Am. Acad. Matrim. Law. 61, 69 (2008) (describing the wave of reform

Supreme Court
OF
Nevada

(O) 1947A

to alimony statutes as compensation "for loss of human capital by virtue of non-market work engaged in by the claimant during the marriage"); *see also* Collins, *The Theory of Marital Residuals*, 24 Harv. Women's L.J. at 49 ("[T]here should be some degree of sharing of post-divorce incomes to reflect the returns flowing from efforts made while the marital joint venture was operational—an equitable sharing of the residual economic benefits from work done during the marriage."). Given the contractual and cooperative undertakings implicit in a marriage, alimony might be seen as a remedy fashioned for the economic losses resulting from splitting one household into two through divorce. *See Family Dissolution* § 5.02 cmt. a (recognizing that divorce creates financial losses for spouses that, "[w]ithout reallocation, . . . are not likely to fall equitably as between them"). Such a loss could come in the form of lower income-earning potential due to forgoing career opportunities for the sake of the marriage, *see* Ira Mark Ellman, *The Theory of Alimony*, 77 Cal. L. Rev. 3, 51 (1989) (describing alimony as compensation for marital investment, i.e., "conduct giving rise to a compensable loss in earning capacity" upon divorce), or a lower standard of living than reasonably expected due to the early termination of the marriage, *see generally* Collins, *The Theory of Marital Residuals*, 24 Harv. Women's L.J. at 49-50 (recognizing that the return from efforts made during the marriage may not materialize until after the divorce). As a remedy, a court can award alimony to make the "spouse whole at the end of the marriage by rewarding efforts in homemaking, childrearing, interruption of a career, or contributions to the success of the other." *Id.* at 39-40.

Our case law's concern for maintaining a spouse's standard of living post-divorce is reflected in this rationale for alimony. Enabling the

lower-income-earning spouse to maintain a lifestyle as close as possible to the lifestyle enjoyed during the marriage has consistently been an important aim of this court. *See, e.g., Wright v. Osburn*, 114 Nev. 1367, 1369, 970 P.2d 1071, 1072 (1998) (deeming the spousal support award insufficient because the wife would not be able to "maintain the lifestyle she enjoyed during the marriage or a lifestyle commensurate with" her former husband); *Sprenger v. Sprenger*, 110 Nev. 855, 860, 878 P.2d 284, 287 (1994) (remanding with instructions to award alimony such that the spouse may "live as nearly as fairly possible to the station in life she enjoyed before the divorce") (internal quotation marks omitted); *Gardner v. Gardner*, 110 Nev. 1053, 1058, 881 P.2d 645, 648 (1994) (increasing alimony by ten years because the wife's "contribution to the community over many years [was] not fairly recognized by the two-year alimony award"); *Rutar v. Rutar*, 108 Nev. 203, 208, 827 P.2d 829, 832 (1992) (increasing the alimony award where the previous award only provided "a standard of living far below that to which [the wife and children] have been accustomed"). This court reaffirmed this goal in *Shydler v. Shydler*, 114 Nev. 192, 954 P.2d 37 (1998), by noting that two of the primary purposes of alimony "are to narrow any large gaps between the post-divorce earning capacities of the parties and to allow the recipient spouse to live 'as nearly as fairly possible to the station in life [ ] enjoyed before the divorce.'" *Id.* at 198, 954 P.2d at 40 (alteration in original) (citations omitted) (quoting *Sprenger*, 110 Nev. at 860, 878 P.2d at 287-88).

Like the need-based factors, NRS 125.150(9) codifies some factors to help a district court assess the economic losses caused by the marriage and subsequent divorce. A district court must consider: "[t]he duration of the marriage," NRS 125.150(9)(d); "[t]he income, earning

capacity, age and health of each spouse," (9)(e); "[t]he standard of living during the marriage," (9)(f); the spouse's career before the marriage, (9)(g); specialized education or training obtained during the marriage, (9)(h); and "[t]he contribution of either spouse as homemaker," (9)(i). After considering these factors, and any other relevant circumstance, the district court may award alimony under NRS 125.150(1)(a) to compensate a spouse for non-monetary contributions to the marriage and economic losses from the early termination of the marriage, such as lost income-earning potential or a decreased standard of living.

## C.

Dennis, then, is incorrect when he asserts that alimony may only be awarded to meet financial need and that the district court abused its discretion by basing its alimony award on an economic loss theory. The district court found that Dennis's income "dwarfed" Gabrielle's; his average net monthly income was $58,000 while hers was only $3,800. As a result, the district court awarded Gabrielle alimony of $18,000 per month for nine years. The district court, however, ordered payment in a one-time lump sum out of the community property and discounted the award by a four percent average rate of return. This resulted in a $1,630,292 lump-sum alimony award to Gabrielle. Gabrielle asserts that alimony was necessary to narrow the large income gap between her and Dennis and to maintain her marital standard of living.[2] We disagree.

_____

[2]These were the only two possible bases for alimony, as Gabrielle was not a homemaker and did not forgo career opportunities as a result of her marriage to Dennis. Gabrielle argues that she contributed to Dennis's success and to the marriage by picking up and moving whenever it was necessary to further Dennis's career, but the district court expressly found

SUPREME COURT
OF
NEVADA

(O) 1947A

While a district court may generally award alimony to narrow large post-divorce gaps in income and to maintain the parties' marital standard of living, the nature and value of the community property Gabrielle received in the divorce obviated any basis for awarding alimony. Gabrielle can earn between $500,000 and $800,000 in passive annual income from the cash assets she received in the divorce. This passive income from interest and dividends easily covers Gabrielle's monthly expenses and far exceeds the actual alimony award of $18,000 per month that the district court deemed just and equitable. Accordingly, we reject Gabrielle's argument that alimony was necessary to narrow her and Dennis's large post-divorce income gap and to maintain her pre-divorce standard of living.

1.

A large gap in income, alone, does not decide alimony. The award must meet the receiving spouse's economic needs or compensate for economic losses resulting from the marriage and subsequent divorce. *See Family Dissolution* § 5.03 cmt. b ("Disparity in the post-divorce incomes of the spouses does not itself provide the basis of a claim [to share the other spouse's income.]"); *Nousari v. Nousari*, 94 So. 3d 704, 706 (Fla. Dist. Ct. App. 2012) ("The purpose of permanent alimony is not to divide future income to establish financial equality between the parties, so disparity in income alone does not justify an award of permanent alimony.") (internal quotation marks and citation omitted). As *Shydler* recognized, "our case law does not require the district court to award alimony so as to effectively equalize salaries." 114 Nev. at 199, 954 P.2d at 41; *see also Gardner*, 110

that Gabrielle's nursing career allowed her the flexibility to move and that her career did not suffer by moving to different locations for Dennis.

Nev. at 1058, 881 P.2d at 648 (increasing alimony but recognizing that it would "still fail to achieve income parity between the [spouses]"). Justice and equity only require alimony to achieve more parity in post-divorce income levels when there is economic need, the marriage and subsequent divorce contributed to the disparate income levels, or one spouse cannot maintain the marital standard of living while the other spouse maintains or exceeds the marital standard of living.

For example, in *Shydler*, during a seventeen-year marriage, the husband obtained a general contractor's license and built a successful company. 114 Nev. at 196, 954 P.2d at 39. The wife worked in the insurance industry during the marriage, first as an insurance adjustor then founding her own insurance business. *Id.* But the wife's business shrank over time and the husband's drinking problems interfered with the wife's work, "particularly during a ten-month period of time when [the husband] could not legally drive." *Id.* Upon divorce, the husband earned more than $100,000 per year, while the wife could only earn $25,000 to $59,000 per year. *Id.* at 196-97, 954 P.2d at 40. The parties also had a minor son. *See id.* at 199, 954 P.2d at 41. "In light of the disparate incomes of the parties and the lifestyle enjoyed by [the wife] prior to the divorce," the court held equity favored an alimony award to the wife. *Id.* at 198-99, 954 P.2d at 41.

Similarly, in *Sprenger*, during a marriage of nearly 22 years, the husband "developed the business acumen [to] provide[ ] him with a thriving business and substantial assets." 110 Nev. at 859, 878 P.2d at 287. The wife was a licensed nurse before the marriage, but then "gave up her career in order to take care of the children and household duties." *Id.* The district court awarded the wife alimony of $1,500 per month for up to two years, along with a 25-percent interest in a partnership owned by the

husband and his parents, which was valued at $837,408. *Id.* at 858-59, 878 P.2d at 287. But the wife was "at the mercy" of the husband and his parents as to whether she would ever receive any income from the partnership. *Id.* at 859-60, 878 P.2d at 287. This court reversed the district court's alimony award and remanded for the district court "to both increase and extend [the wife's] alimony award such that [the wife] is able to live 'as nearly as fairly possible to the station in life she enjoyed before the divorce' for the rest of her life or until she remarries or her financial circumstances substantially improve." *Id.* at 860, 878 P.2d at 287 (quoting *Heim v. Heim*, 104 Nev. 605, 612-13, 763 P.2d 678, 683 (1988)).

In both cases, an aspect of the marriage contributed to the receiving spouse's lower income-earning potential, which resulted in a post-divorce decrease from the marital living standard. In *Shydler*, the parties shared a child, and the husband's "heavy drinking and related problems caused [the wife] to neglect her insurance business." 114 Nev. at 194, 954 P.2d at 38. And, in *Sprenger*, the wife "gave up her career as a nurse" to take care of the parties' children. 110 Nev. at 857, 878 P.2d at 286. In both cases, the lower-income-earning spouse could not maintain the marital standard of living after the divorce. *See id.* at 860, 878 P.2d at 287; *Shydler*, 114 Nev. at 198-99, 954 P.2d at 41.

Under these cases, alimony to achieve parity in income must further some underlying rationale for alimony such as economic need, the receiving spouse's inability to maintain the marital standard of living, or the receiving spouse's decreased income-earning potential as a result of the marriage. The district court did not have discretion to award alimony solely to achieve income parity between Dennis and Gabrielle following the divorce.

SUPREME COURT
OF
NEVADA

(O) 1947A

16

2.

Gabrielle is correct that we have upheld, and sometimes required, alimony to maintain the parties' marital standard of living. But Gabrielle can maintain her standard of living from the marriage without alimony. The passive income from the assets Gabrielle received in the divorce will easily cover her approximately $16,000 in monthly expenses and give her the ability to maintain savings and investment accounts. The district court acknowledged but then disregarded this passive income because the award was not need-based.[3] The district court should have considered the nature and amount of the property disposition, including passive income from the assets awarded to the parties, when determining whether Gabrielle needed alimony to maintain her standard of living. *See* NRS 125.150(9)(j); *Lang v. Lang*, 425 N.W.2d 800, 802 (Mich. Ct. App. 1988) ("It would be the height of absurdity to suggest that a spouse, to whom income-producing property was awarded in a property settlement, would be entitled to have his or her need for alimony, or ability to pay alimony, determined without regard to the income produced by that property."). The substantial cash assets Gabrielle received in the divorce, which Gabrielle

---

[3]The dissent takes issue with our characterization that the district court disregarded the passive income Gabrielle would earn from the assets she received. But the district court's order, set forth in relevant part below, did just that:

> Recognizing that this is not a need based spousal support case, this Court similarly (as with Dennis' incentive compensation income) discounts the passive income that Gabrielle will earn from the property that she will receive as part of the property division.

SUPREME COURT
OF
NEVADA

(O) 1947A

will not need to draw on to support herself or maintain her standard of living, negated any basis for alimony to maintain Gabrielle's pre-divorce standard of living in this case.[4] *Cf. Shydler*, 114 Nev. at 198, 954 P.2d at 40-41 (disapproving of the district court's alimony award, which "compelled [the wife] to utilize her community property share for support, while [the husband's] share of the community property was actually providing a substantial income for his support"); *see Italiano v. Italiano*, 873 So. 2d 558, 560 (Fla. Dist. Ct. App. 2004) (reversing when the trial court awarded alimony despite its finding that there was "no current need for alimony because [the spouse's] needs could be completely met from her income-producing assets"); *Billion v. Billion*, 553 N.W.2d 226, 231 (S.D. 1996) (recognizing the "symbiotic relationship between" property division and alimony, and that "the need for post-divorce alimony can be reduced or obviated" by awarding certain income-producing assets to a spouse who might otherwise receive alimony).

The principles underlying permanent alimony do not contemplate an award for a spouse who is, after the community is divided, capable of supporting him or her self, able to maintain the marital standard of living on his or her own, and not economically disadvantaged in his or her earning capacity as a result of the marriage. The lack of a proper basis for alimony in this case is especially concerning given the risk that an alimony

---

[4]Citing *Shydler*, the dissent argues that Gabrielle should not have to consume her community asset distribution to resolve a post-divorce income disparity. The district court expressly found, however, that "[u]nlike *Shydler*, *supra*, this is not a situation in which Gabrielle will need to deplete or rely on the principle amounts of her property award in the divorce for her support."

award could have been improperly motivated by Dennis's marital indiscretions and role in bringing about the end of the marriage. *See Rodriguez*, 116 Nev. at 998, 13 P.3d at 418 ("[W]hen considering an award of alimony, the court may not consider either party's misconduct or fault."). Accordingly, we hold that the district court abused its discretion by awarding alimony without a proper basis, and reverse the award.[5]

### III.

Turning to the division of property, a court must make an equal disposition of community property in a divorce unless there is a "compelling reason" to make an unequal disposition. NRS 125.150(1)(b). An appellate court reviews a district court's disposition of community property deferentially, for an abuse of discretion. *See Wolff v. Wolff*, 112 Nev. 1355, 1359, 929 P.2d 916, 919 (1996) ("This court's rationale for not substituting its own judgment for that of the district court, absent an abuse of discretion, is that the district court has a better opportunity to observe parties and evaluate the situation.").

Dissipation, or waste, can provide a compelling reason for the unequal disposition of community property. *Lofgren v. Lofgren*, 112 Nev. 1282, 1283, 926 P.2d 296, 297 (1996) ("[I]f community property is lost, expended or destroyed through the intentional misconduct of one spouse, the court may consider such misconduct as a compelling reason for making an unequal disposition of community property and may appropriately augment the other spouse's share of the remaining community property."). "Generally, the dissipation which a court may consider refers to one spouse's use of marital property for a selfish purpose unrelated to the marriage in

---

[5]As a result, we also reject Gabrielle's arguments in her cross-appeal that she should have received a larger alimony award.

 

contemplation of divorce or at a time when the marriage is in serious jeopardy or is undergoing an irretrievable breakdown." 24 Am. Jur. 2d *Divorce and Separation* § 524 (2018); *see also Dissipation*, Black's Law Dictionary (10th ed. 2014) (defining "dissipation" as "[t]he use of an asset for an illegal or inequitable purpose, such as a spouse's use of community property for personal benefit when a divorce is imminent").

The district court found that Dennis dissipated $4,087,863 in community property. A large portion of the dissipated community property relates to Dennis's extramarital affairs and children, some relates to expenditures on his family, and the other large portion comprises a variety of other expenditures beyond those Dennis claimed in his financial disclosures. Dennis argues that he did not dissipate any community property because the marital estate continued to grow tremendously—from $4 million to $47 million by his reckoning—during the time of alleged dissipation. Gabrielle counters that the district court should have found more dissipation and begun its calculations even before the marriage underwent an irreconcilable breakdown in 2010 when the parties informally separated.

A.

The $1,853,212 Dennis diverted from the community for his extramarital affairs provided a compelling reason for an unequal disposition of community property. *See, e.g., Neely v. Neely*, 563 P.2d 302, 305 (Ariz. Ct. App. 1977) (affirming an unequal property distribution because the husband spent community property on his girlfriend); *Rabbath v. Farid*, 4 So. 3d 778, 780 (Fla. Dist. Ct. App. 2009) (recognizing that "[a]dultery can be considered in fashioning an unequal distribution of assets and liabilities to the extent the marital misconduct depleted marital

resources"); *In re Marriage of Meadow*, 628 N.E.2d 702, 704-05 (Ill. App. Ct. 1993) (same); *Omayaka v. Omayaka*, 12 A.3d 96, 101 n.3 (Md. 2011) (noting that "[a]ppellate courts have held that improper expenditures on a paramour . . . constitutes dissipation"); *McNair v. McNair*, 987 S.W.2d 4, 7 (Mo. Ct. App. 1998) (same); *Basile v. Basile*, 605 N.Y.S.2d 133, 135 (App. Div. 1993) (same); *Spruill v. Spruill*, 624 S.W.2d 694, 697-98 (Tex. Ct. App. 1981) (same); *see also* Brett R. Turner, *Unintentional Conduct as Dissipation of Marital Property*, 21 Equitable Distribution J. 13 (2004) ("[F]unds spent on paramours are almost automatically dissipated."). The district court did not abuse its discretion in making an unequal disposition of community property in the amount spent on the extramarital affairs.

Dennis's argument that, because the overall value of the estate grew during the marital misconduct, his spending of community funds had no adverse economic impact on the marital estate is unpersuasive. *Wheeler v. Upton-Wheeler* held that spousal abuse or marital misconduct is a compelling reason to make an unequal disposition of community assets only when it has an "adverse economic impact" on the spouse. 113 Nev. 1185, 1190, 946 P.2d 200, 203 (1997). But *Wheeler* considered the economic consequences of physical abuse in a marriage, which has a more tenuous connection to community property than Dennis's misconduct in this case, where he admits he spent community funds on extramarital affairs and the support of a family without Gabrielle's knowledge.

B.

The district court found that Dennis also dissipated $72,200 through post-separation, pre-divorce gifts to family members. A gift to a family member that violates a preliminary injunction constitutes dissipation. *Lofgren*, 112 Nev. at 1283, 926 P.2d at 297 (upholding an

SUPREME COURT
OF
NEVADA

(O) 1947A

unequal disposition where the husband transferred funds to his father despite an injunction enjoining such actions). Absent a specific injunction, a gift to a family member is not dissipation if there is an established pattern or history of giving such gifts to family members during the marriage. *See Robinette v. Robinette*, 736 S.W.2d 351, 354 (Ky. Ct. App. 1987) (recognizing that "giving gifts to family members could constitute dissipation" but the evidence "in the instant case indicates that such charity was a marital enterprise"); *Decker v. Decker*, 435 S.E.2d 407, 413 (Va. Ct. App. 1993) (affirming a finding of no dissipation when it was evident that the gifts to family members were part of the couple's pre-separation estate planning). But a gift to a family member is dissipation when there is no previous history of gift giving or the amount of the gift during the divorce is substantially greater than past gifts. *See Kleet v. Kleet*, 264 S.W.3d 610, 618 (Ky. Ct. App. 2007) (deeming as dissipation a husband's gifts to family when divorce was impending because the value of the gifts "far exceeded those given prior to that time").

Dennis routinely gave money to his family throughout the marriage, and often did so without consulting Gabrielle. The district court appropriately found that such "relatively long-standing and regular" expenditures on family members were not dissipation. But Dennis also gave $15,000 to his aunt after the joint preliminary injunction, which he could not establish as regular or routine. Additionally, he made two non-routine payments of $3,600 to his father and gave his father $50,000 for a political campaign contribution. The district court appropriately found that such gifts from Dennis, totaling $72,200, amounted to dissipation and afforded a compelling reason for an unequal disposition of community property.

## C.

The final $2,162,451 of alleged waste represents the amount Dennis spent in excess of his self-declared monthly expenses that he failed to justify to the district court as a marital expense. The district court considered these expenses as potential waste, at least in part, because Dennis failed to provide a forensic accountant to do a waste analysis after promising to do so. Instead, Gabrielle's own forensic accountant analyzed over 27,200 of the parties' financial transactions and categorized expenditures into those for a marital purpose and those that the expert claimed were "potential community waste." The forensic accountant included funds spent on extramarital affairs and yacht purchases among the transactions that were "potential community waste." But the forensic accountant also included expenditures that were in excess of Dennis's self-proclaimed expenses in his financial disclosure forms that were neither clearly for a marital purpose nor clearly for a nonmarital purpose, labeling this category "potential community waste not elsewhere classified." The district court ultimately required Dennis to account for each of these "not elsewhere classified" transactions, beginning in 2010, and to prove that, no matter how large or small the amount, the transactions served a marital purpose, not dissipation.

The district court erred by requiring Dennis to explain everyday expenditures over the course of several years, including before this divorce action began, and finding dissipation when he failed in this task. Dennis was not called to account for these expenditures because Gabrielle raised a reasonable inference that the transactions furthered a purpose inimical to the marriage, that he made them to diminish Gabrielle's community property share, or even that they were unusually large withdrawals from

SUPREME COURT
OF
NEVADA

(O) 1947A

23

community accounts. *Cf.* 24 Am. Jur. 2d *Divorce and Separation* § 524 (2018) (defining dissipation as the "use of marital property for a selfish purpose unrelated to the marriage in contemplation of divorce or at a time when the marriage is in serious jeopardy or is undergoing an irretrievable breakdown"). Rather, the district court required Dennis to explain these expenditures because they exceeded his self-described monthly expenses and he failed to follow through on providing a forensic accountant after promising to do so.

While Dennis's spending could appear wasteful in the aggregate, his expenditures appear typical of his general overconsumption throughout the marriage, and they do not provide a compelling reason for an unequal disposition of community property. *See Putterman v. Putterman*, 113 Nev. 606, 609, 939 P.2d 1047, 1048-49 (1997) ("Almost all marriages involve some disproportion in contribution or consumption of community property."). A district court must differentiate between ordinary consumption for higher-income earners such as Dennis, which is not necessarily dissipation, and misappropriation of community assets solely for personal gain, which can provide a compelling reason for an unequal disposition of community property when such expenditures redirect assets needed for basic community support. *Id.* at 609, 939 P.2d at 1048 ("It should be kept in mind that the secreting or wasting of community assets while divorce proceedings are pending is to be distinguished from undercontributing or overconsuming of community assets during the marriage."). We therefore reverse the district court's unequal disposition of

community property by the $2,162,451 labeled in the forensic accounting report as "potential community waste not elsewhere classified."[6]

### D.

Gabrielle argues the district court erred by cutting off community property before the written divorce decree. We agree under these circumstances. The district court ended its calculations involving community property on February 26, 2016, when it orally pronounced the parties divorced, so that it could issue a written order following the trial. The written divorce decree was not entered until six months later, on August 22, 2016.

Under Nevada law, the district court's oral pronouncement of divorce did not terminate the community. *See* NRS 123.220; *Rust v. Clark Cty. Sch. Dist.*, 103 Nev. 686, 689, 747 P.2d 1380, 1382 (1987) ("An oral pronouncement of judgment is not valid for any purpose, NRCP 58(c); therefore, only a written judgment has any effect . . . ."). NRS 123.220 makes all property acquired after the marriage community property, with no exception for an oral pronouncement of divorce. We therefore remand this matter for the district court to consider the accumulation and waste of community property between its oral pronouncement of the termination of community property and the actual termination when the written divorce

---

[6]We reject Gabrielle's cross-appeal for lost opportunity costs from forgone return on investments from the wasted assets, as well as her claim that Dennis's yacht purchase and sale was dissipation. *See Putterman*, 113 Nev. at 609, 939 P.2d at 1048-49 (distinguishing disproportionate consumption from dissipation). Given the speculative nature of lost opportunity costs, and that the marital estate grew exponentially during this time period, the district court appropriately found that lost opportunity cost did not amount to a compelling reason for an unequal disposition of property.

decree was entered. *See Gojack v. Second Judicial Dist. Court*, 95 Nev. 443, 445, 596 P.2d 237, 239 (1979) (holding that a district court "is without jurisdiction to enter a final decree of divorce without contemporaneously disposing of the community property of the parties").

IV.

The district court sanctioned Dennis $19,500 for making 39 transactions of $10,000 or more during the divorce proceedings—$500 for each transaction—based on the joint preliminary injunction, which prohibited either party from using community property "except in the usual course of business or for the necessities of life." EDCR 7.60(b)(5) allows a district court to sanction a party for failing or refusing to comply with a court order "without just cause" and when the sanction is reasonable under the facts of the case.

What constitutes spending beyond "the usual course of business or for the necessities of life," as stated in the preliminary injunction in this case, is not clear and unambiguous given the parties' wealth. *See* Brett R. Turner, *Entry and Enforcement of Preliminary Injunctions Against Dissipation of Marital Property*, 16 Divorce Litig. 102 (2004) ("[M]ost broad general injunctions must have an exception for transfers in the ordinary course of life or business, and this exception can give many questionable transactions sufficient plausible reasonableness to avoid contempt."); *see also Cunningham v. Eighth Judicial Dist. Court*, 102 Nev. 551, 559-60, 729 P.2d 1328, 1333-34 (1986) ("An order on which a judgment of contempt is based must be clear and unambiguous, and must spell out the details of compliance in clear, specific and unambiguous terms so that the person will readily know exactly what duties or obligations are imposed on him."). Thus, instead of ordering sanctions, the appropriate remedy for violations

SUPREME COURT
OF
NEVADA

(O) 1947A

of the automatic joint preliminary injunction due to overspending would be an unequal disposition of property. To the extent Dennis violated the joint preliminary injunction by making transactions in excess amounts, the appropriate remedy was a finding of waste and an unequal disposition of the community property. Accordingly, we reverse the district court's sanctions and deny Gabrielle's cross-appeal for greater sanctions.[7]

## V.

The district court also awarded $75,650 in costs to Gabrielle, representing half the fee her forensic accountant charged. The district court did not state a basis for awarding costs, and there is no apparent basis for doing so. *See U.S. Design & Constr. Corp. v. Int'l Bhd. of Elec. Workers, Local 357*, 118 Nev. 458, 462, 50 P.3d 170, 173 (2002) ("A district court is not permitted to award . . . costs unless authorized to do so by a statute, rule or contract."). There was no offer of judgment that would allow for costs or fees, *see* NRS 125.141 (allowing for attorney fees and costs if a party who rejects an offer of judgment fails to obtain a more favorable judgment), and the court explicitly found that there was no prevailing party, *see* NRS 18.020 (allowing for costs to the prevailing party in certain types of cases). Nor did the court award costs as part of a sanction under EDCR 7.60 for violations of the joint preliminary injunction. Even if Gabrielle was entitled to costs, the district court did not state any basis for awarding expert fees in excess of $1,500. *See* NRS 18.005(5) (allowing a district court to award more than

---

[7]To the extent these expenditures over $10,000 were included as expenses "not elsewhere classified" by Gabrielle's forensic accountant, which we reversed as ordinary overconsumption, the district court may reconsider on remand whether specific large expenditures violated the joint preliminary injunction, which could provide a compelling reason for an unequal disposition of community property.

SUPREME COURT
OF
NEVADA

(O) 1947A

27

$1,500 for an expert witness's fees only if the court determines "that the circumstances surrounding the expert's testimony were of such necessity as to require the larger fee"); *Khoury v. Seastrand,* 132 Nev. 520, 541, 377 P.3d 81, 95 (2016) ("[B]ecause the district court awarded expert fees in excess of $1,500 without stating a basis for its decision, we hold that the district court abused its discretion."). We therefore reverse the district court's award for costs to Gabrielle and deny her cross-appeal for attorney fees.

****

We affirm in part, reverse in part, and remand for proceedings consistent with this opinion. We reverse the alimony award, because Gabrielle received income-producing assets as her share of the community property that obviated any arguable basis for alimony. We affirm the district court's unequal disposition of community property due to Dennis's spending on extramarital affairs and gifts to family, but reverse the unequal disposition of property based on Dennis's everyday consumption. We remand for the district court to consider the accumulation and waste of community property between its ineffective oral termination of community property and the actual termination of community property upon the entry of the written divorce decree. Finally, we reverse the sanctions for violations of the joint preliminary injunction and the award of costs to Gabrielle.

_____, J.
Pickering

We concur:

_____, C.J.
Gibbons

_____, J.
Parraguirre

_____, Sr. J.
Douglas

HARDESTY, J., with whom STIGLICH, J., agrees, concurring in part and dissenting in part:

While I concur with the majority on all other issues, I must dissent to the reversal of the district court's award of alimony for three reasons. First, the majority disregards our deferential standard of review and the wide discretion vested in the district court to award alimony in the nature of compensation for economic losses as a result of the marriage and divorce, including to equalize post-divorce earnings or maintain the marital standard of living. Second, the majority, after spending considerable time lamenting the absence of a statutorily defined purpose for alimony in our statutes, ultimately summarizes Nevada's jurisprudence: "alimony can be 'just and equitable' both when necessary to support the economic needs of a spouse and to compensate for a spouse's economic losses from the marriage and divorce, including to equalize post-divorce earnings or help maintain the marital standard of living." Majority opinion *ante* at 7. Then, inexplicably and without discussing the district court's reasoning to support a post-divorce earning disparity, the majority simply declares that Gabrielle's income-producing assets from her share of the community property "obviated any basis for awarding alimony." *Id.* at 14. In effect, in the majority's view, Gabrielle has earned enough. And third, without one citation to the record or the district court's decision, the majority speculates that the district court's award of alimony "could have been improperly motivated by Dennis's marital indiscretions and role in bringing about the end of the marriage." *Id.* at 19.

There is no common law of alimony, it "is wholly a creature of statute." *Rodriguez v Rodriguez*, 116 Nev. 993, 998, 13 P.3d 415, 418 (2000) (internal quotation marks omitted). When granting a divorce, a district

court may award alimony to either spouse "as appears just and equitable." NRS 125.150(1)(a). When determining if alimony is just and equitable, a district court must consider the 11 factors listed in NRS 125.150(9). *See DeVries v. Gallio*, 128 Nev. 706, 711-13, 290 P.3d 260, 264-65 (2012). The district court may also consider any other relevant factor, but it must not consider the marital fault or misconduct, or lack thereof, of the spouses. *Rodriguez*, 116 Nev. at 999, 13 P.3d at 419 ("Alimony is not a sword to level the wrongdoer. Alimony is not a prize to reward virtue."). The decision of whether to award alimony is within the discretion of the district court. *Buchanan v. Buchanan*, 90 Nev. 209, 215, 523 P.2d 1, 5 (1974) ("In determining whether alimony should be paid, as well as the amount thereof, courts are vested with a wide range of discretion."). A district court's decision in a divorce proceeding is reviewed for an abuse of discretion. *Shydler v. Shydler*, 114 Nev. 192, 196, 954 P.2d 37, 39 (1998). "Rulings supported by substantial evidence will not be disturbed on appeal." *Id.*

Against this deferential standard of review, we evaluate the district court's 102 pages of Findings of Fact and Conclusions of Law in this case, 14 pages of which are devoted to the alimony award. After reciting the applicable provisions of NRS 125.150 concerning the district court's statutory authority to award alimony, the district court lists and later analyzes all of the factors in NRS 125.150(9). Before conducting an analysis of the evidence, however, the district court noted the absence of statutory guidelines to provide guidance as to the relative weight to be applied to each factor; discussed the scholarly article by the Honorable David A. Hardy in *Nevada Alimony: An Important Policy in Need of a Coherent Policy Purpose*, 9 Nev. L.J. 325 (2009); recognized the difference between alimony based on "need" and support based on compensation for economic losses as a result

of the marriage and divorce; and recited our rule in *Shydler*, 114 Nev. at 198, 954 P.2d at 40 (quoting *Shydler* to explain that "'[a]lthough the amount of community property to be divided between the parties may be considered in determining alimony,' a spouse should not be required to deplete his/her share of the community property for support"). Finally, the district court noted the admonition in *Rodriguez* against awarding alimony to "level the wrongdoer." *Rodriguez*, 116 Nev. at 999, 13 P.3d at 419.

The district court's analysis is both thorough and specific. It begins by finding "there is a sufficient factual basis for the Court to consider an award of support that is in the nature of compensation for economic losses as a result of the marriage and divorce." The district court then supported its finding with a detailed analysis of the factors listed in NRS 125.150(9)(a), (e), and (k), including extensive comparisons of the parties' pre- and post-divorce earnings. The district court correctly found that "Dennis'[s] income historically has dwarfed Gabrielle's income throughout their marriage" and projected the difference in the parties' average monthly net income to be $54,200.

The district court next analyzed Dennis's argument under NRS 125.150(9)(b) and (j) that Gabrielle will leave the marriage with assets that could earn passive income of between $500,000 and $800,000 annually. However, as the district court recognized, Gabrielle's standard of living showed annual expenses (between $180,000 and $240,000) substantially in excess of her projected monthly income of $3,800. In this 25-year marriage, the district court found that "Gabrielle relied on the existence of the parties' marriage to maintain the standard of living achieved as a result of Dennis'[s] income capacity" and awarded spousal support in the amount of $18,000 per month for 108 months. Consistent with the principles in

*Sargeant v Sargeant*, 88 Nev. 223, 228-29, 495 P.2d 618, 621-22 (1972), the district court reduced the award to a lump sum payment of $1,630,292.

The majority's determinations that the district court "disregarded this passive income because the award was not need-based" and "should have considered the nature and amount of the property disposition, including passive income from the assets awarded to the parties, when determining whether Gabrielle needed alimony to maintain her standard of living," majority opinion *ante* at 17, are, quite simply, wrong. Neither statement is supported by the record or the district court's findings. And certainly, neither the record nor the findings shows an abuse of discretion by the district court.

Additionally, the majority's conclusion that the income-producing assets distributed to Gabrielle completely "obviated any basis for awarding alimony," *id.* at 14, misapprehends the district court's reasoning for the award. The district court plainly followed the rule in *Shydler* that the division of community property should be considered, but a spouse should not be required to deplete his or her share of the community property for support. In this, the district court specifically found, consistent with our recognized rule, that alimony can be "just and equitable" to compensate for a spouse's economic losses from the marriage and divorce, *including to equalize post-divorce earnings or maintain the marital standard of living.* The award in this case had to do with the disparity in the parties' post-divorce earnings, the right to which arose out of Gabrielle's reliance on the existence of the marriage and Dennis's substantial income capacity. Other than the majority's declaration that her income producing assets "obviated any basis for awarding alimony," the majority fails to address or even

explain why Gabrielle should consume her assets in order to resolve a post-divorce income disparity.

Finally, the majority resorts to pure speculation when it claims that the district court's alimony award "could have been improperly motivated by Dennis's marital indiscretions and role in bringing about the end of the marriage." Majority opinion *ante* at 19. To the contrary, the district court was careful to recognize the admonition against doing so in its conclusions of law. The district court observed that it "should not consider the respective 'merits' of the parties in adjudicating the issue of spousal support. . . . '[Alimony] is not a sword to level the wrongdoer,' nor is it a 'prize to reward virtue'" (quoting *Rodriguez*, 116 Nev. at 999, 13 P.3d at 419). To suggest that the district court did otherwise impugns the integrity and extraordinary effort of the district court to resolve this issue within the confines of the law.

I would affirm the award of alimony because the district court did not abuse its discretion in making this award.

_____, J.
Hardesty

I concur:

_____, J.
Stiglich